No. 107,158

STATE OF KANSAS, *Appellee*, v. WILLIAM D. HOLT II, *Appellant*.

(336 P.3d 312)

Opinion filed
October 31, 2014.

*Meryl Carver-Allmond*, of Capital Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jacqueline J. Spradling*, chief deputy district attorney, argued the cause, and *Jodi Litfin*, assistant district attorney, *Chadwick J. Taylor*, district attorney, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: William Holt II was convicted by a jury of premeditated first-degree murder and aggravated burglary. Utilizing K.S.A. 21-4635, the sentencing judge imposed life imprisonment without the possibility of parole for 50 years for Holt's premeditated first-degree murder conviction. Now, Holt appeals his convictions and murder sentence, arguing: (1) Three comments by the prosecutor during opening and closing arguments constituted reversible misconduct; (2) the jury instruction on reasonable doubt was clearly erroneous; (3) even if none of those alleged errors—the three separate instances of prosecutorial misconduct or the instructional error—is individually reversible error, the cumulative error doctrine requires reversal of his convictions; and (4) the sentencing judge erred in imposing a hard 50 sentence because (a) the hard 50 sentencing statute in effect at the time of Holt's sentencing is unconstitutional, and (b) there was insufficient evidence

to support the single aggravating circumstance relied upon by the sentencing judge when imposing the hard 50 sentence.

We reject all of Holt's arguments except his contention that K.S.A. 21-4635 is unconstitutional. We, therefore, affirm his convictions, vacate his hard 50 sentence imposed under the unconstitutional statute, and remand for resentencing.

### FACTS AND PROCEDURAL BACKGROUND

This case involves the September 2010 shooting death of Mitch Vose in Topeka. At that time, Vose had recently started dating Wendy Henderson who had been in an on-again/off-again relationship with Holt over the course of several years. Back in 2008, Holt had moved out of the Topeka apartment he shared with Henderson and relocated to Ohio where he enrolled in college classes. Despite the long distance between them, the couple had continued their relationship for a time, talking on the phone every day. Also, Holt had made annual visits to Topeka, staying at a motel for 2 weeks at a time.

In July 2010, Henderson met Vose, and the two started dating. Henderson then called Holt and tried to break up with him, telling him that she was pursuing a relationship with Vose. Despite Henderson's new boyfriend, Holt came to Topeka in mid-August 2010 as previously planned. Henderson met with him to discuss the breakup, and Holt tried to talk Henderson out of ending their relationship.

Around this time, Henderson discovered that she was pregnant with Vose's child, and she mentioned this to Holt. She had not yet told Vose. Henderson testified that Holt's response was that she should not tell Vose about the pregnancy and should have an abortion. Law enforcement officers who interviewed Henderson after Vose's murder testified that Henderson told them that Holt tried to convince her to move to Ohio, where she and Holt could raise the child together. Henderson did not follow Holt's advice. Instead, she stayed in Topeka, informing Vose she was pregnant about a week before he was killed. Henderson testified that she continued to try to end the romantic relationship with Holt, speak-

ing to Holt by telephone. Each time, Holt was sad and upset and tried to talk her out of breaking up with him.

During one of Henderson's telephone conversations with Holt, Vose asked if he could speak with Holt. Holt agreed, and Henderson handed the phone to Vose. Although Henderson could not hear what Holt was saying, she observed Vose's reaction and described him as being "in awe" and "shock." Later, when Henderson asked Vose about the conversation, he indicated that Holt had threatened to kill him.

Despite the breakup, Henderson remained in contact with Holt, texting him and talking on the phone. At one point, Holt mentioned that a mutual friend had told him that Vose lived on Maryland Street, which Henderson confirmed, and Holt told Henderson that if anything happened to Vose, he was not a part of it. But then at another point, Holt gave the impression that he had moved on and accepted that his romantic relationship with Henderson had come to an end. Henderson testified that Holt told her "we could be friends, but if it got too hard for him, he would . . . move on."

Just before the weekend of September 17, 2010, Henderson and Holt were talking about Henderson's weekend plans. Henderson said that she was going to be at Vose's house, watching his 8-year-old son. Holt indicated that he did not want her to go there that weekend because he wanted to play online video games with her. On the night of September 17, Henderson went to a bar with a girlfriend. She had previously texted Holt and told him that she was going out and was planning to spend the night at a friend's house. But, unbeknownst to Holt, Henderson's plans changed. She ended up sleeping at Vose's house.

In the early morning hours of September 18, 2010, just before 5 a.m., Henderson and Vose were asleep in the same bed. Vose's son was asleep in the adjacent bedroom. Henderson awoke when she heard whispering, like someone was making a "shushing sound," telling someone else to be quiet. Henderson could not see well without her glasses, and it was dark in the room. Henderson called out, "Hello?" because she thought maybe Vose's son was up, but nobody answered. Then, she saw a shadowy figure appear in the doorway of the bedroom. Henderson realized that this silhou-

ette was taller than Vose's son. She could not tell who the person was, but "it was a big kind of stalky-like person," and she thought maybe it was Vose's neighbor, Joshua Jones, "who had maybe forgotten something and was just in the house." Henderson again called out, "Hello?" but got no answer.

Henderson woke up Vose and told him that she thought somebody was in the house. Vose sat up and called out something like, "[C]an I help you?" There was no answer. Henderson suggested that they turn on the light, so Vose crawled over Henderson and got out of bed to flip the light switch on the wall. Henderson grabbed her phone off the night stand and curled up in a fetal position under the covers. Vose turned on the light, and Henderson heard a "pop and then a gasp for like air—it was just like a catching of breath and then it was silent." Henderson lay still because she did not know what would happen next, but she thought Vose had been shot. She dialed 911 without ever speaking into the phone because she did not want to make a sound. Then, after Henderson heard the phone operator speaking, she hung up the phone. Not knowing whether the emergency responders could trace her call, Henderson then texted a friend, who called 911 for her. Law enforcement officers arrived shortly thereafter, swept the house for intruders and moved Henderson and Vose's son outside. Upon inspecting the house, officers discovered that a screen in an open kitchen window had been cut on three sides. A shotgun blast to Vose's chest had been fatal.

Vose's neighbor, Jones, testified that around 4 a.m. on September 18, he was sitting on his front porch diagonally across the street from Vose's house. Jones saw an unfamiliar car pull up to Vose's house and shut off its lights. Thinking this was strange, Jones started approaching by walking through his yard. When Jones got to the street, the driver turned on the headlights and pulled to the front of Jones' house to speak to him. Jones identified Holt as the driver of the car. Holt told Jones he was going to meet some friends on California Street, and Jones gave him directions.

Holt drove away, and Jones went back to his front porch. Approximately 15 minutes later, Jones saw Holt drive back down the street from the opposite direction. Then, after another 15 minutes,

Jones saw Holt drive down the street a third time, and this time he was driving faster. Jones went inside his house to make sandwiches, and, not long after, he saw numerous police cars outside Vose's home.

Brandy Mullins was also on the porch with Jones that morning. She testified that she saw the same car pull up to Vose's house and that she went with Jones to approach the car. She was sure that the car drove by a second time and thought it drove by a third time as well. Mullins also identified Holt as the driver of the car.

Kansas law enforcement officers requested that Ohio law enforcement officers go to Holt's Ohio residence and ask about his whereabouts during the time of the shooting. Holt initially said he had been in Ohio at the time. Later, he admitted that he had driven to Topeka that night to see Henderson. Holt also admitted to being in Vose's neighborhood near the time of the shooting, but he denied shooting Vose. Law enforcement had the license tag number from the silver car that Holt was seen driving in Topeka, and it matched a car located at an Enterprise Rent-A-Car in Ohio.

Holt's friend Greg Haffner testified that Holt arrived at Haffner's Ohio residence around 5 p.m. on September 18, 2010, and told him that someone had been shot in Kansas and that the police were looking for him (Holt). Holt asked Haffner to take his 12-gauge shotgun for "a couple days," and Haffner agreed. Holt then removed his shotgun from the trunk of a silver rental car and gave it to Haffner. Holt also gave him $200. Haffner testified that he had been with Holt on September 11, 2010, when he purchased the shotgun and several rounds of ammunition at Bass Pro Shops. The weapon came with two barrels, one for hunting and one for home defense. Officers retrieved the shotgun from Haffner.

When law enforcement officers searched Holt's residence, they found a carton for a shotgun, a nylon shotgun case, a spare barrel, a box of 12-gauge shotgun shells, and a receipt from Bass Pro Shops for the purchase of the shotgun. Officers also found Holt's Enterprise Rent-A-Car agreement. Forensic testing of the rental car revealed that samples taken from the backseat contained "particles that were highly indicative of gunshot residue."

Haffner had saved a spent shell casing when he and Holt went to test fire the shotgun the day after Holt purchased the gun, which was 6 days before Vose's murder; he turned the shell casing over to law enforcement officers. Forensic testing on the shotgun revealed that the shell casing seized from Holt's residence matched the one submitted by Haffner. But the forensic scientist could not conclude whether Holt's shotgun was the weapon that killed Vose.

Holt was charged with premeditated first-degree murder, in violation of K.S.A. 21-3401(a), and aggravated burglary, in violation of K.S.A. 21-3716. At trial Holt's defense theory—brought out through cross-examination and argument—was that Henderson thought the intruder's silhouette matched the build of Jones, who was Holt's neighbor and had been a drug dealer who provided marijuana to Vose. At the time of the shooting, Jones had recently lost his job and his child after someone informed law enforcement of his drug dealing. The defense theory suggested that Jones killed Vose out of suspicion that he was the informant.

The jury convicted Holt as charged. Now Holt brings a timely appeal. This court has jurisdiction under K.S.A. 22-3601(b)(1) (off-grid crime; maximum sentence of life imprisonment imposed).

## PROSECUTORIAL MISCONDUCT

We first consider Holt's arguments that the prosecutor committed misconduct at three points during the trial. Holt argues that each instance justifies a reversal of his convictions.

Appellate review of allegations of prosecutorial misconduct requires a two-step process. First, an appellate court determines whether there was misconduct, *i.e.*, whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. Second, if misconduct is found, the appellate court determines whether those comments compel reversal, *i.e.*, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Crawford*, 300 Kan. 740, Syl. ¶ 2, 334 P.3d 311 (2014); *State v. Armstrong*, 299 Kan. 405, 416, 324 P.3d 1052 (2014) (citing *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 [2013]; *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]).

### 1. *Opening Statement—Appeal to Sympathy*

According to Holt, the prosecutor improperly appealed to the jury's sympathy at two points in the trial. One statement was made during opening remarks and the other was made during the rebuttal portion of the State's closing argument.

As Holt points out, it is well known that jurors "must decide a case on evidence and controlling law, and not on sympathy, emotion, or prejudice." *State v. Jones*, 298 Kan. 324, 338, 311 P.3d 1125 (2013). Therefore, " '[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law.' *State v. Baker*, 281 Kan. 997, 1016, 135 P.3d 1098 (2006)." *State v. Brown*, 295 Kan. 181, 212-13, 284 P.3d 977 (2012). This means that a prosecutor has a duty to refrain from making improper, leading, inflammatory, or irrelevant statements to the jury and "must guard against appeals to jurors' sympathies or prejudices. [Citation omitted.]" *State v. Hall*, 292 Kan. 841, 853, 257 P.3d 272 (2011).

#### a. *Misconduct*

Holt's first argument focuses on the following argument made during the State's opening statement:

"And you'll learn that the 8-year-old son, who's now 9, of Mitch Vose[] was in the neighboring next-door bedroom at the time the defendant killed his father, and that [Henderson] has given birth to a new son, so that now there is a 9-year-old boy and a newborn boy both with no dad."

Holt argues the fact that the victim's sons now have "no dad" was not relevant to the issues in the case and improperly appealed to sympathy. For support, Holt cites *State v. Henry*, 273 Kan. 608, 44 P.3d 466 (2002), and *State v. Adams*, 292 Kan. 60, 253 P.3d 5 (2011).

In *Henry*, this court reversed and remanded the case for a new trial, in part, because the prosecutor urged the jury to " 'think about Mother's Day yesterday, [the victim's] mom how she must have felt. How [the victim] will never have a chance to be a mother, this young professional sharp, security conscious woman . . . .' " *Henry*, 273 Kan. at 640. The *Henry* court found that the prose-

cutor's reference to the mother's grief and her testimony was not relevant to the case, and the prosecutor "clearly intended to inflame the passion and prejudice of the jury." 273 Kan. at 641.

In the other case cited by Holt, *Adams*, 292 Kan. 60, during the rebuttal portion of the State's closing argument, the prosecutor stated: " 'This case doesn't just mean something to the defendant. It means something to [the victim]. This is the only chance [the victim] will ever have to have someone held accountable for taking his life. So this day is as much about him if not more than anyone else.' " 292 Kan. at 67. The *Adams* court found this was an improper appeal that "focused on sympathy for the victim" and diverted "attention from the jury's function of determining guilt based on the instructions rather than because of sympathy." 292 Kan. at 68.

The State does not address *Henry* or *Adams* in its appellate brief. Instead, the State argues that the prosecutor was merely stating facts that were later presented to the jury and did not ask the jury to base its deliberations on sympathy for the victim or divert the jury from the evidence. But the State acknowledges that "[t]he statement may have appealed to the jury's emotion[s]."

The State is correct that the jury would learn through evidence that Vose had been a father. Further, this evidence was relevant. Henderson initially thought Vose's 9-year-old son might be the person who woke her, and her pregnancy with Vose's child explained Holt's motive for the killing—jealousy. But the prosecutor took a step beyond reciting this evidence and noting its significance; the prosecutor emphasized that the children were left without a father, a fact not relevant to proving the charged crimes and significant only as an appeal to sympathy. Thus, the statements were similar to the improper comments in *Henry* and *Adams* and were misconduct. See Kansas Rules of Professional Conduct (KRPC) 3.4 (2013 Kan. Ct. R. Annot. 601) ("A lawyer shall not . . . [e] in trial, allude to any matter that the lawyer does not reasonably believe is relevant . . . ."); KRPC 3.8 (2013 Kan. Ct. R. Annot. 614) (special responsibilities of a prosecutor).

b. *Not Reversible*

As discussed in *Adams*, this court has held that a prosecutor's argument regarding the impact of a crime on a victim or a victim's family may constitute reversible error because it diverts attention from the evidence and law. *Adams*, 292 Kan. at 67; see *Tosh*, 278 Kan. at 92 (finding that prosecutor's statements that jury should convict defendant in order to protect his daughter was one of the bases for reversible prosecutorial misconduct); *State v. Donesay*, 265 Kan. 60, 85-88, 959 P.2d 862 (1998) (murder victim's widow testified in detail regarding her relationship with her husband and her husband's friendly disposition; the admission of this testimony was irrelevant as to the crime charged and constituted reversible error).

Nevertheless, the determination of reversibility depends on the circumstances of each case. To determine whether a prosecutor's misconduct is reversible—that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial—an appellate court considers three factors: (1) whether the misconduct was gross and flagrant, (2) whether it was motivated by prosecutorial ill will, and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight ·in the minds of jurors. No one factor is controlling. *Tosh*, 278 Kan. at 93; see *State v. Huddleston*, 298 Kan. 941, 953-54, 318 P.3d 140 (2014); *Bridges*, 297 Kan. at 1012.

In determining whether the statement about Vose's children not having a dad was gross and flagrant, we consider whether the comments were repeated, emphasized improper points, were planned or calculated, violated well-established or unequivocal rules, or violated a rule designed to protect a constitutional right. See *Bridges*, 297 Kan. 989, Syl. ¶ 18; *State v. Kemble*, 291 Kan. 109, 123-24, 238 P.3d 251 (2010).

Under the circumstances of this case, compelling factors suggesting that the conduct was gross and flagrant include the prosecutor's emphasis of an improper point and the prosecutor's violation of a well-established rule. As already discussed, Kansas caselaw has long established that a prosecutor should not make

statements intended to inflame the prejudices of the jury or to divert the jury's attention from its duty to decide the case based on the evidence and the controlling law. *Tosh*, 278 Kan. at 90. We, therefore, conclude the statement was gross and flagrant misconduct.

The next step is to examine whether the statement was made with ill will. Relevant factors include "whether the conduct was deliberate or in apparent indifference to a court's ruling. [Citation omitted.]" *Bridges*, 297 Kan. at 1016; see *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011). While the statement was contrary to well-established caselaw, the record in this case does not reveal any other indications of ill will. The fact that two children were left without a father was not emphasized again; the prosecutor did not return to the point during either opening statements or closing arguments. We, therefore, see no indication of ill will.

The final factor is whether the prosecutor's misconduct had little effect on the minds of the jurors. As a majority of this court recently reiterated in *Crawford*, before this factor can override the other two factors, an appellate court must be able to say that the State can meet both the statutory harmlessness standard stated K.S.A. 60-261 and the constitutional standard stated in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). *Crawford*, 300 Kan. 740, Syl. ¶ 4; *Bridges*, 297 Kan. at 1012-13 (citing *Tosh*, 278 Kan. at 97).

We have observed that, as a practical matter, the result of the harmless error evaluation depends on the outcome of the *Chapman* constitutional standard. " '[B]oth the constitutional and nonconstitutional error clearly arise from the very same acts and omissions,' and the constitutional standard is more rigorous. Thus, the State necessarily meets the lower statutory standard under K.S.A. 60-261 if it meets the higher constitutional standard." *Armstrong*, 299 Kan. at 417 (citing *Bridges*, 297 Kan. at 1015; *State v. Herbel*, 296 Kan. 1101, 1111, 299 P.3d 292 [2013]). Under the constitutional standard the State must establish "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the

verdict." *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011) (citing *Chapman*, 386 U.S. 18), *cert. denied* 132 S. Ct. 1594 (2012).

Here, the State is able to meet the *Chapman* standard. Properly admitted evidence established that Vose's sons were left without a father. Thus, even without the prosecutor's prompting, jurors could have easily concluded that Vose's 9-year-old and newborn sons were fatherless. As a result, the impact of the prosecutor's improper appeal to sympathy is limited. Further, the point was not emphasized or a theme, and the evidence against Holt was strong. Consequently, we conclude beyond a reasonable doubt the statement did not affect the verdict.

## 2. *Prosecutor's Closing Rebuttal—Appeal to Sympathy*

The other statement that Holt also argues improperly appealed to the sympathy of the jurors was made during the rebuttal portion of the State's closing argument. Holt complains about the italicized portion of the following comments:

"But what I want you to know is that while your deliberations may be difficult, they are a privilege. I'm not undermining the difficulty, but *it is a privilege that all of you have to right a wrong. You and only you can right the wrong that the defendant has committed in taking a young man's life* who just wanted to drive a truck for AAA. It is your opportunity, your privilege[,] to hold the defendant accountable for killing Mitch Vose out of spite and revenge. This, in essence, then is a top-line case, and it's a top-line case because when you find that the defendant is guilty, your verdict is the defendant['s] top line, guilty, first-degree murder; top line, guilty, aggravated burglary."

### a. *Misconduct*

With regard to the prosecutor's statement that the jurors had a privilege to "right the wrong that the defendant has committed in taking a young man's life," Holt argues that it was designed to improperly distract the jury from its duty to determine whether he was guilty beyond a reasonable doubt. He cites *State v. Finley*, 268 Kan. 557, 998 P.2d 95 (2000), to support his position.

The prosecutor in *Finley* informed the jurors that they were the ones who enforce the laws in this country and that " 'this kind of drug use in our community' " cannot be tolerated, especially when a person dies, and therefore the jury had to find the defendant

guilty. 268 Kan. at 572. This court found the comment constituted reversible misconduct because it was completely unrelated to any question the jury should have considered. Also, it was not clear whether the error had little, if any, likelihood of changing the result of the trial. 268 Kan. at 572.

The *Finley* court relied, in part, on *State v. Ruff*, 252 Kan. 625, 847 P.2d 1258 (1993), where the prosecutor committed reversible misconduct by urging the jury, " '[D]o not allow this conduct to be tolerated in our county.' " 252 Kan. at 631. This court found the prosecutor's implication problematic—that if the jury found Ruff not guilty, her conduct *would* be tolerated. 252 Kan. at 636; see *State v. Martinez*, 290 Kan. 992, 1013-14, 236 P.3d 481 (2010) (prosecutor improperly asked jury to return a guilty verdict in order to tell a child rape victim that " 'she did the right thing' " by reporting the crime).

In countering Holt's arguments, the State cites two cases—*State v. Fielden*, 42 Kan. App. 2d 710, 217 P.3d 986 (2007), and *State v. Nguyen*, 285 Kan. 418, 172 P.3d 1165 (2007)—to support its contention that the statement was not improper; instead, it was an appropriate "general" appeal for justice. In *Fielden*, the Court of Appeals determined that a closing argument that included, among other things, a comment that " 'the peace that [the victim and her son] are entitled to will only come' " with guilty verdicts was not outside the wide latitude allowed in closing arguments. This was true even though the comment "may be categorized as appealing to the jury's emotion." 42 Kan. App. 2d at 717.

In *Nguyen*, which was filed approximately 10 months after *Fielden*, the prosecutor mentioned the upcoming July 4th holiday and argued that the victim " 'had his life, his liberty, his pursuit of happiness taken away from him. All that he has left is justice.' " 285 Kan. at 423. Then, the prosecutor asked the jury to give the victim " 'justice.' " 285 Kan. at 423. The *Nguyen* court noted that there was support in other jurisdictions for the notion that it is improper to tell the jury to " 'do its job' " or that the jury's oath requires it to find the defendant guilty. 285 Kan. at 424. But the *Nguyen* court was not persuaded that the prosecutor's "justice" statements were akin to telling the jurors to do their job or that

their oaths required a guilty verdict. 285 Kan. at 425. The court stated that it is permissible, if not expected, for a prosecutor to generally argue for justice, *e.g.*, justice for the citizens of Kansas. Yet the court specified that it was hesitant to make a bright-line rule on the matter. Instead, the court indicated that "[p]erhaps the touchstone is whether the argument seeks to divert the jury from the evidence so as to obtain a conviction based upon sympathy for the victim." 285 Kan. at 425. Because the prosecutor's argument was largely based on the evidence, and because the jury was instructed immediately after closing arguments that it could not " 'consider this case based on sympathy or prejudice,' " this court concluded the prosecutor did not exceed the bounds of permissible argument. 285 Kan. at 426.

Consistent with this distinction, since *Fielden*, several decisions by this court have followed the stricter view adopted in *Finley* and, as in *Finley* and *Ruff*, found that statements regarding justice for the victim—as opposed to justice for the citizens of Kansas—fall outside the bounds of permissible argument discussed in *Nguyen*. Recently, this court reiterated that "a prosecutor cannot ask the jury to convict a defendant in order to give the victim justice. [Citation omitted.]" *State v. Schumacher*, 298 Kan. 1059, 1073, 322 P.3d 1016 (2014). In *Schumacher*, the prosecutor stated in his rebuttal closing argument that " '[y]ou can laugh about justice, that word, but it means something and it certainly means something for [the victim],' " and " '[y]our verdict is the last word for [the victim], and it's the last word for justice.' " 298 Kan. at 1072. This court noted that it has often refused to condone an act or statement by the prosecutor that draws the jury's attention away from the fundamental task of weighing evidence and instead invites the jury to rely on underlying emotions to convict. 298 Kan. at 1073. The *Schumacher* court concluded that the prosecutor's requests for justice for the victim appeared to have been intended to appeal to jurors' empathy instead of their duty to weigh and evaluate the evidence to determine the defendant's guilt. Thus, although the statements did not create reversible error, they were inappropriate. 298 Kan. 1073-74.

Similarly, other recent cases have found misconduct when the prosecutor focuses on justice for the victim. See, *e.g.*, *State v. Anderson*, 294 Kan. 450, 462-63, 276 P.3d 200 (finding prosecutor erred in referring to defendant as a " 'little, little man' " and asking for " 'redemption' " for victim, as this request was akin to asking for justice for victim and improperly diverted jury's attention from its task), *cert. denied* 133 S. Ct. 529 (2012); *State v. Simmons*, 292 Kan. 406, 418-19, 254 P.3d 97 (2011) (prosecutor's comment that appealed for sympathy for victim inappropriately diverted jury's attention from its fundamental task); *State v. Brinklow*, 288 Kan. 39, 52, 200 P.3d 1225 (2009) (court determining that "arguing for a conviction to give the victim justice is prosecutorial misconduct"). Other recent cases draw a line between generally asking for justice and asking for justice for a victim. See *State v. Britt*, 295 Kan. 1018, 1031, 287 P.3d 905 (2012); *State v. McCorkendale*, 267 Kan. 263, 284-86, 979 P.2d 1239 (1999), *overruled on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009).

Applying these cases to the present facts, stating that the jury has the "privilege . . . to right a wrong," and "[y]ou and only you can right the wrong that the defendant has committed in taking a young man's life" is akin to asking the jury to administer justice for the victim. See *State v. Bailey*, 677 N.W.2d 380, 404 (Minn. 2004) (prosecutor engaged in misconduct in murder trial by appealing to passion and prejudice of the jury when prosecutor said the State prosecuted defendant to " 'right a wrong' " and that victim's family deserved resolution to this case). The prosecutor's argument was more than a general appeal for justice. It focused on the defendant and the victim, thereby seeking to "divert the jury from the evidence so as to obtain a conviction based upon sympathy for the victim." *Nguyen*, 285 Kan. at 425. Consequently, we conclude the prosecutor strayed from the line of appropriate argument.

b. *Not Reversible*

We, therefore, must consider whether this misconduct requires us to reverse Holt's convictions. Regarding whether the conduct was gross and flagrant, the comments were not repeated or emphasized, but they appear to have been planned and calculated.

Furthermore, as our discussion reveals, over the last 7 or more years this court has disapproved of prosecutors' arguments calling for justice for the victim and imposing on the jury a duty of protecting the community. Because the conduct violated this established caselaw, we conclude the conduct was gross and flagrant.

We do not perceive any ill will, however. The point was not a theme in the prosecutor's argument and was not emphasized. And following the improper statements the prosecutor urged the jury to consider all the evidence: "Take the time to talk about it, sort through all of the evidence, and when you're done, we will be waiting for you, and we know that you will agree that the defendant is guilty." Further, the prosecutor's general conduct during the trial and closing arguments did not exhibit a sense of ill will against either Holt or the court.

Finally, the State has satisfied the *Chapman* harmless error test and persuades us beyond a reasonable doubt that the prosecutor's comments did not affect the outcome of the trial in light of the entire record. See *Ward*, 292 Kan. 541, Syl. ¶ 6 (citing *Chapman*, 386 U.S. 18). The evidence against Holt was sufficiently strong to persuade us that there is no reasonable possibility the comments contributed to the verdict. Holt's attempts to cast doubt by pointing to Vose's next door neighbor, Jones, as a suspect in the murder fall short in light of the circumstantial evidence and Holt's admissions.

Holt had made a death threat to Vose; and shortly before the shooting, Holt had told Henderson that if anything happened to Vose, Holt was not a part of it. Then, just days before the September 18, 2010, shooting of Vose, Holt purchased a shotgun and asked Henderson not to stay at Vose's house the weekend of the shooting. Holt eventually admitted that he had driven a rental car to Topeka the weekend of the shooting to see Henderson, who was his "whole world." He also admitted to being in Vose's neighborhood near the time of the shooting. And witnesses spotted Holt in the rental car at and near Vose's house around the time of the shooting. Finally, Holt arrived at his friend Haffner's Ohio residence approximately 14 hours after the murder, reporting that "somebody was shot" and the "police were looking for [Holt]." At that point, Holt asked

Haffner to "look after his shotgun," which Holt retrieved from the trunk of his rental car.

These incriminating circumstances and statements are sufficient to convince us beyond a reasonable doubt that the prosecutor's appeal for justice for the victim, while misconduct, is not a basis for reversing Holt's conviction.

### 3. *Rebuttal Argument—Burden of Proof*

Turning to the third instance of alleged misconduct, Holt argues the prosecutor erred during the rebuttal portion of the State's closing argument by misstating the prosecution's burden of proof. The prosecutor discussed Instruction No. 5, which stated, in part: "Your only concern in this case is determining if the defendant is guilty or not guilty." Then the prosecutor said, "I want to give you an example," and she used the following analogy involving a child with a crayon:

"[Y]ou see the little boy standing there with a purple crayon [in] his hand and there's a pretty big rainbow drawn on the bedroom wall, and you say, come on, what did you draw that on the wall for? And the boy with his purple crayon with a purple rainbow says, I didn't do it.

"What you get to do is to know that that is a guy right in the area with the tools he needs, which is the purple crayon, he draws something that favors to him, which is the sunshine. In this case, the favors [*sic*] to the defendant is [Henderson]. *And he—the little boy can say I didn't do it all day long, but your responsibility is to decide the difference between possible and probable.*" (Emphasis added.)

At that point, defense counsel objected on the basis that the argument "misstates the burden of proof." The trial judge asked the attorneys to approach the bench, and then they discussed the matter outside the presence of the jury. The judge asked the prosecutor what the rest of her argument was going to be, to which the prosecutor answered, "That the defendant's denial that he didn't do it is not probable, that there is enough evidence of guilt beyond a reasonable doubt."

In response to the prosecutor's assertion that she had said nothing objectionable, defense counsel argued, "[T]here's nothing about distinguishing possible and probable in the [jury] instructions, and I think it greatly misstates the burden of proof and I think it's improper for that reason." The judge then denied defense

counsel's objection, finding that "[t]he statement that was made does not go to the burden of proof in this case. The statement that was made goes to the believability of the evidence in this case and certain aspects of it."

When the rebuttal argument resumed, the prosecutor told the jury, "Your responsibility is to decide what is possible and what is probable. And the probability of the evidence in this case, including the defendant's denial, [in] your deliberations. It's the same probability of the little boy saying I didn't draw the rainbow." The prosecutor concluded her rebuttal without any mention of reasonable doubt.

### a. *Misconduct*

On appeal, Holt renews his argument that the prosecutor incorrectly defined and impermissibly diluted the State's burden of proof. As he points out, if the prosecutor did incorrectly define reasonable doubt or impermissibly dilute the State's burden of proof, the prosecutor's statements would be outside the wide latitude given to prosecutors in closing arguments. *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012); *State v. Magallanez*, 290 Kan. 906, 914-15, 235 P.3d 460 (2010); see *State v. Phillips*, 295 Kan. 929, Syl. ¶ 5, 287 P.3d 245 (2012) ("A defendant is denied a fair trial when a prosecutor misstates the law and the facts are such that the jury could have been confused or misled by the statement.").

The State contends that the prosecutor did not misstate the burden of proof—the prosecutor merely used the crayon-boy analogy to refer to Holt's credibility and the plausibility of his denial of involvement in the crimes. If this was clear, the prosecutor arguably would not have committed misconduct because a prosecutor is given considerable latitude to address the weaknesses of the defense. *State v. Stone*, 291 Kan. 13, 18, 237 P.3d 1229 (2010) (citing *State v. Burden*, 30 Kan. App. 2d 690, 703, 46 P.3d 570 [2002], *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 [2003]). Likewise, when a case turns on conflicting stories, it is proper for a prosecutor to assert reasonable inferences based on the evidence and to argue that certain testimony is not believable, but the jury

must be left to draw ultimate credibility determinations. *State v. Duong,* 292 Kan. 824, 830, 257 P.3d 309 (2011).

For example, in *State v. Davis,* 275 Kan. 107, 121, 61 P.3d 701 (2003), this court found three challenged statements to be reasonable inferences drawn from the evidence and appropriate arguments regarding why testimony was not believable. First, the prosecutor argued the victim's statements were more credible than the defendant's because the victim made his statements to a law enforcement officer while in an emotional state, and the defendant made his statements after 10 months "with plenty of time for reflection and creation." 275 Kan. at 122. Second, the prosecutor argued the evidence indicated that the victim "should be believed." 275 Kan. at 122. Finally, the prosecutor claimed the defendant's allegation that the victim "set this whole thing up" was not believable. 275 Kan. at 123. This court held that the prosecutor was within the latitude afforded to the State during closing arguments because the prosecutor "stated reasonable inferences based on the evidence," and the statements did not constitute vouching for the victim's credibility. 275 Kan. at 122-23.

There are some similarities between the examples in *Davis* and the crayon-boy analogy in that the prosecutor asked the jury to weigh the credibility of Holt's denial of participation in the crimes—"that is a guy right in the area with the tools he needs" and "the little boy can say I didn't do it all day long." But the prosecutor continued by saying that "[y]our responsibility is to decide what is possible and what is probable" and "[i]t's the same probability of the little boy saying I didn't draw the rainbow." These comments can be interpreted as asking the jury to find it probable that Holt was guilty, especially since the prosecutor told the jury that she was giving them an example of determining "whether or not the defendant is guilty." The ambiguity was made even more misleading when, after the bench conference, the prosecutor told the jury it was their "responsibility . . . to decide what is possible and what is probable." The statement sounds like a representation of the State's burden of proof.

In summary, while the prosecutor's intent may have been to solely discuss the credibility of certain evidence or inferences, that

message was garbled, and the effect was to dilute the State's burden of proof to a mere probability. Any attempt to lower the burden of proof—or even to define reasonable doubt—is misconduct. See *Magallenez*, 290 Kan. at 914 ("[P]rosecutors embellish on the definition of the burden of proof in criminal cases at their peril."); *State v. Walker*, 276 Kan. 939, 956, 80 P.3d 1132 (2003) (" 'Efforts to define reasonable doubt, other than as provided in PIK Crim. 3d 52.02 [burden of proof, presumption of innocence, and reasonable doubt], usually lead to a hopeless thicket of redundant phrases and legalese, which tends to obfuscate rather than assist the jury in the discharge of its duty.' ").

We, therefore, conclude the prosecutor's comments regarding the boy and his crayon were misconduct.

b. *Not Reversible*

As we consider whether this instance of misconduct was reversible error, we turn to the first factor of whether the conduct was gross and flagrant. See *State v. Kemble*, 291 Kan. 109, 123, 238 P.3d 251 (2010). We again have a situation where the statement violated long-established caselaw prohibiting a prosecutor from diluting the State's burden of proof or attempting to define reasonable doubt. Further, the prosecutor represented to the judge that she would continue her argument by discussing the State's burden of proof beyond a reasonable doubt, which might have clarified any ambiguity, but she failed to do so. Consequently, we conclude the misconduct was gross and flagrant.

Under the second factor, this court must determine whether the prosecutor's statements were made as a result of ill will. See *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013). As we have discussed, the prosecutor's comments appear to be an ill-phrased attempt to ask the jurors to weigh the evidence and the credibility of Holt. The fact the message was garbled appears to be more a result of the extemporaneous nature of the rebuttal comments than a planned attempt to dilute the State's burden of proof. Given the context of the statement, it does not appear that the prosecutor was motivated by ill will.

Finally, we turn to the third factor in the harmlessness inquiry, whether the evidence against the defendant was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of the jurors. 297 Kan. at 1012-13. Significantly, as will be discussed in the next issue and not withstanding the prosecutor's inept analogy, the trial court properly instructed the jury on the burden of proof using the pre-2005 version of PIK Crim. 3d 52.02 (burden of proof, presumption of innocence, and reasonable doubt). This court presumes the jury followed the trial court's instructions, and it may be concluded that the court's guidance served to mitigate any potential harm caused by the prosecutor's statements. See *State v. Huddleston*, 298 Kan. 941, 956, 318 P.3d 140 (2014) ("Although these instructions do not give the prosecutor a free pass on misconduct, they are appropriate considerations when evaluating whether a jury was misled."); *State v. Bunyard*, 281 Kan. 392, 406-07, 133 P.3d 14 (2006) (prosecutor's misstatement of the law must be considered in the context of the jury instructions given by the court), *disapproved on other grounds by State v. Flynn*, 299 Kan. 1052, 329 P.3d 429 (2014); *State v. Hebert*, 277 Kan. 61, 85, 82 P.3d 470 (2004) (noting jury had been given proper PIK instruction and was told counsel's statements were not evidence); *State v. Jamison*, 269 Kan. 564, 572-73, 7 P.3d 1204 (2000) (prosecutor's misstatement on the law on premeditation was not reversible error when the jury was properly instructed on the law).

Further, as we have discussed, the circumstantial evidence against Holt is strong and leads us to conclude beyond a reasonable doubt that the prosecutor's misstatements did not affect the outcome of the trial. See *Huddleston*, 298 Kan. at 957 (citing *Bridges*, 297 Kan. 989, Syl. ¶ 15). The improper comments do not warrant reversing Holt's convictions.

## REASONABLE DOUBT INSTRUCTION

Next, Holt argues for the first time on appeal that Instruction No. 7, the reasonable doubt instruction, was erroneous because it lowered the State's burden of proof, which resulted in structural

error. Instruction No. 7, which was identical to the pre-2005 version of PIK Crim. 3d 52.02, stated:

> "The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty until you are convinced from the evidence that he is guilty.
>
> "The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you must find the defendant not guilty; if you have no reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.)

See PIK Crim. 3d 52.02 (1995 Supp.).

Holt, who failed to object to the instruction at trial, must establish that the instruction was legally inappropriate. See *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012). In attempting to do so, Holt focuses on the second paragraph of the instruction and argues the trial judge erred by using the word "any" in both portions of the concluding sentence. Instead, Holt contends "each" should have been substituted for the second "any," which would make the last sentence read as follows: If you have a reasonable doubt as to the truth of *any* of the claims required to be proved by the State, you must find the defendant not guilty; if you have no reasonable doubt as to the truth of *each* of the claims required to be proved by the State, you should find the defendant guilty." Holt's proposed language is identical to the reasonable doubt instruction found in PIK Crim. 3d 52.02 and PIK Crim. 4th 51.010. See *State v. Gallegos*, 286 Kan. 869, 877-78, 190 P.3d 226 (2008) (approving current version of PIK Crim. 3d 52.02). Holt contends that the second use of the word "any" caused the State's burden of proof to be diluted.

Since Holt submitted his appellate brief this court has repeatedly rejected his argument. In *State v. Herbel*, 296 Kan. 1101, 299 P.3d 292 (2013), this court concluded that "[w]hile the older PIK instruction used in Herbel's trial was not the preferred instruction, it was legally appropriate. [Citations omitted.]" 296 Kan. at 1124. Subsequently, this ruling has been consistently applied. See, *e.g.*, *Miller v. State*, 298 Kan. 921, 936-38, 318 P.3d 155 (2014); *State*

*v. Smyser,* 297 Kan. 199, 206, 299 P.3d 309 (2013); *State v. Waggoner,* 297 Kan. 94, 98-99, 298 P.3d 333 (2013).

Consistent with these cases, we reject Holt's argument that the reasonable doubt instruction was erroneous.

### CUMULATIVE ERROR

In the alternative, Holt contends that cumulative trial errors require reversing his convictions. Specifically, he contends that the instances of prosecutorial misconduct and the trial court's use of the any/any reasonable doubt instruction, when considered collectively, violated his constitutional right to a fair trial, and, therefore, the case must be remanded for a new trial. We have rejected his reasonable doubt instruction argument but have concluded there were three instances of prosecutorial misconduct. Thus, we must consider whether the prosecutor's three misstatements collectively have so great an impact on the trial as to warrant reversing Holt's convictions.

The test is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial under the totality of the circumstances. See *State v. Tully,* 293 Kan. 176, 205-07, 262 P.3d 314 (2011). In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. See *State v. Ward,* 292 Kan. 541, 578, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). "No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant." *State v. Colston,* 290 Kan. 952, Syl. ¶ 15, 235 P.3d 1234 (2010); see, *e.g., Alvarez v. Boyd,* 225 F.3d 820, 824-25 (7th Cir. 2000) (listing various factors to be considered in cumulative error analysis), *cert. denied* 531 U.S. 1192 (2001); *United States v. Fernandez,* 145 F.3d 59, 66 (1st Cir. 1998) (same). Because the standard under *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), applies to the three instances of

prosecutorial misconduct, " 'the cumulative error must be harmless beyond a reasonable doubt.' " *Tully*, 293 Kan. at 205 (quoting *United States v. Toles*, 297 F.3d 959, 972 [10th Cir. 2002]).

As we examine the three statements in combination, it is significant that the three errors had no relationship with one another. Although two instances appealed to sympathy, they did so in very different ways. Further, as we have noted, the prejudicial impact of these two statements was largely ameliorated by other comments of the prosecutor, including her urging the jury to "[t]ake the time to talk about it, sort through all of the evidence." And the potential prejudice caused by the crayon-boy analogy was ameliorated by the reasonable doubt instruction, which the jury is presumed to have followed.

Finally, as already stated, the evidence against Holt was strong when considered as a whole. Under the totality of the circumstances, we are convinced beyond a reasonable doubt that, even in light of any cumulative effect, the three instances of prosecutorial misconduct did not affect the jury's verdict.

## ERROR IN IMPOSING A HARD 50 SENTENCE

After Holt's conviction, the State filed notice of its intent to seek a hard 50 sentence, alleging that (1) Holt knowingly or purposefully created a risk of death to more than one person; (2) he committed the crime in an especially heinous, atrocious, or cruel manner; and (3) the victim was particularly vulnerable at the time of the killing. See K.S.A. 21-4636(b), (f). At the sentencing hearing, defense counsel argued that the evidence did not support the aggravating circumstances alleged by the State, and several mitigating circumstances weighed against the imposition of a hard 50 sentence. Holt presented evidence regarding several mitigating circumstances including: his age (26 years old) at the time of the crime, his lack of criminal history, his service to this country as a Marine, and the ongoing support of his parents. Holt's parents testified in support of these claims.

The sentencing judge found by a preponderance of the evidence that a hard 50 sentence was warranted based on the first circumstance alleged by the State, *i.e.*, Holt knowingly or purposefully

created a risk of death to more than one person. See K.S.A. 21-4636(b). The judge further concluded the aggravating circumstance outweighed any mitigating circumstances.

On appeal, Holt argues the hard 50 sentencing statute in effect at the time of his sentencing, K.S.A. 21-4635, is unconstitutional. Citing *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013), he argues the statute violates the Sixth Amendment to the United States Constitution because based on factors not submitted to a jury and proven beyond a reasonable doubt, it imposes additional punishment, a minimum of 50 years' imprisonment rather than 25 years that would otherwise be imposed for premeditated first-degree murder. Holt's arguments and the State's counter arguments regarding the constitutionality of K.S.A. 21-4635 were considered and addressed by this court in *State v. Soto*, 299 Kan. 102, 322 P.3d 334 (2014).

In *Soto*, this court held that K.S.A. 21-4635, which also governed Soto's sentencing hearing, violates the Sixth Amendment because it "permits a judge to find by a preponderance of the evidence the existence of one or more aggravating factors necessary to impose an increased mandatory minimum sentence, rather than requiring a jury to find the existence of the aggravating factors beyond a reasonable doubt." 299 Kan. 102, Syl. ¶ 9. Given the holding in *Soto*, we need not address the specifics of either Holt's or the State's arguments. Under the *Soto* holding, Holt's sentence was unconstitutionally imposed.

This conclusion leads to the question of how to remedy Holt's unconstitutional sentence. The State, as it did in *Soto*, argues the defect should be considered harmless because we can determine a jury would have been convinced beyond a reasonable doubt that Holt knowingly or purposefully created a risk of death to more than one person. More specifically, the State argues the aggravated circumstance is "necessarily proved" by the verdict. Holt disagrees and also argues that remand is inappropriate because the evidence is insufficient to support a jury finding that an aggravated factor exists.

Similar harmless error arguments were considered in *Soto*. There, we noted that "an *Alleyne* error is also an *Apprendi* [*v. New*

*Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000)] error and this court has recognized that an *Apprendi* error may be subject to harmless error review." *Soto*, 299 Kan. at 124. We also noted, however, that Soto, much like Holt does in the current appeal, argued that a hard 50 error should not be subject to harmless error review because the sentencing court applied a preponderance of the evidence standard when considering the existence of aggravating circumstances, not a beyond-a-reasonable-doubt standard as required by *Alleyne*. We recognized in *Soto* that a higher standard of proof—the reasonable doubt standard—was constitutionally required. 299 Kan. at 126. We also noted that a jury had not determined if mitigating circumstances existed and, if so, whether beyond a reasonable doubt the aggravating circumstances outweighed any mitigating circumstances. 299 Kan. at 126-28.

Given those procedural failures that would exist in any application of K.S.A. 21-4635, the *Soto* court concluded that "only in a rare instance could a hard 50/*Alleyne* error be harmless. [Citation omitted.]" 299 Kan. at 127. Consequently, the *Soto* court determined it would "defer any decision as to whether a modified harmless error standard can apply to a hard 50 error until a case presents itself in which the evidence approaches meeting this exacting test." 299 Kan. at 128. This is not that case. We, therefore, vacate Holt's hard 50 sentence.

## REMAND

In *Soto*, the court determined the case should be remanded for resentencing. 299 Kan. at 128. In this appeal, the State asks for the same remedy as an alternative if we reject, as we have, its arguments regarding the constitutionality of the statute and the harmlessness of any error. K.S.A. 2013 Supp. 21-6620(e) provides authority for a remand. It states:

"(e) Notwithstanding the provisions of subsection (f), for all cases on appeal on or after the effective date of this act, if a sentence imposed under this section, prior to amendment by this act, or under K.S.A. 21-4635, prior to its repeal, is vacated for *any* reason *other than sufficiency of the evidence as to all aggravating circumstances*, resentencing shall be required under this section, as amended by this act, unless the prosecuting attorney chooses not to pursue such a sentence." (Emphasis added.)

Holt argues remand is not appropriate under that provision because (1) the only hard 50 sentencing provision that applies to him is unconstitutional, and (2) the evidence was insufficient to support the aggravating circumstance relied on by the sentencing judge. The State responds by arguing that on remand the sentencing court may utilize the amended hard 50 statute enacted by the Kansas Legislature following the filing of *Alleyne*. See K.S.A. 2013 Supp. 21-6620. The State also argues the evidence was sufficient to establish the aggravating factor relied on by the sentencing judge. These same general arguments were raised in *Soto*.

### 1. *Retroactive Application of K.S.A. 2013 Supp. 21-6620*

In *Soto*, this court declined to resolve the question of whether K.S.A. 2013 Supp. 21-6620 could be retroactively applied. The State, as it does in this case, acknowledged that its arguments relating to the constitutionality of applying the amended hard 50 statute on remand were not ripe because the State has not yet sought application of the amended hard 50 statute. See *Soto*, 299 Kan. at 128-29. Given that the issue was not ripe, the *Soto* court "decline[d] the parties' invitation to issue an advisory opinion on these issues. [Citations omitted.]" 299 Kan. at 129. The *Soto* court noted that "[o]ur decision does not foreclose the parties from presenting their arguments regarding application of the amended statute to the district court at resentencing." 299 Kan. at 129.

The same conclusions apply in this appeal. We cannot resolve the retroactivity question because it is not ripe. See *State v. Williams*, 298 Kan. 1075, 1082, 319 P.3d 528 (2014) ("Generally, Kansas appellate courts do not decide moot questions or render advisory opinions."); *Gannon v. State*, 298 Kan. 1107, Syl. ¶ 2, 319 P.3d 1196 (2014) (stating that under separation of powers doctrine, Kansas courts do not issue advisory opinions but decide actual cases or controversies). But, as in *Soto*, if the State seeks the hard 50 on remand, the parties are not foreclosed from presenting arguments regarding the retroactive application of K.S.A. 2013 Supp. 21-6620.

### 2. *Sufficiency of Evidence Regarding the Aggravating Factor*

The *Soto* court did, however, address Soto's claim that the evidence of the aggravating factor was insufficient, in which case re-

mand would have been inappropriate under K.S.A. 2013 Supp. 21-6620(e). The *Soto* court stated: "While we decline to decide at this juncture whether Soto could be resentenced under the amended hard 50 statute, we find it prudent to address Soto's claim that the evidence of the aggravating circumstance was insufficient." 299 Kan. at 129. We followed this same approach in several subsequent cases. See *State v. Hayes*, 299 Kan. 861, 327 P.3d 414 (2014); *State v. Lloyd*, 299 Kan. 620, 325 P.3d 1122 (2014); *State v. DeAnda*, 299 Kan. 594, 324 P.3d 1115 (2014); *State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014); *State v. Hilt*, 299 Kan. 176, 322 P.3d 367 (2014).

Recently, in *State v. Roeder*, 300 Kan. 901, 942, 336 P.3d 831 (2014), we reexamined this line of cases and concluded that "[o]nce the court determined that Soto's sentence had to be vacated because of the unconstitutional sentencing scheme, the question of whether sufficient evidence existed to meet the requirements of the unconstitutional statute was rendered moot." In this case, like in *Roeder*, questions regarding the sufficiency of any aggravating factor evidence will be germane only if the prosecutor elects to seek resentencing of Holt under the retroactive provision of K.S.A. 2013 Supp. 21-6620(e). And if the prosecutor so elects, the evidence—and even the aggravating factors relied upon—may differ from what was previously presented. Consequently, "[w]hether the sentence might also have been subject to being vacated based upon an insufficiency of the evidence if the sentencing scheme had not been found unconstitutional is an academic question we need not answer." *Roeder*, 300 Kan. at 943.

Consistent with our holding in *Roeder*, we do not address whether sufficient evidence supported the aggravating factor found by the sentencing court in this case—that Holt knowingly or purposefully created a risk of death to more than one person. We vacate Holt's hard 50 sentence and remand for resentencing.

Convictions affirmed, sentence vacated in part, and case remanded for resentencing.

MORITZ, J., not participating.

GERALD T. ELLIOTT, District Judge, assigned.

\* \* \*

JOHNSON, J., dissenting: I agree with the majority opinion up to the point that it determines that the cumulative trial errors, considered collectively, did not require reversal. " 'The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him . . . a fair trial.' " *State v. Magallanez*, 290 Kan. 906, 926, 235 P.3d 460 (2010) (quoting *State v. Cosby*, 285 Kan. 230, 250, 169 P.3d 1128 [2007]). In my view, the prosecutor's multiple instances of misconduct met that test.

First, the prosecutor suggested that one reason the jury should find Holt guilty was the sympathy-evoking, yet irrelevant, fact that the victim's children were left without a father. Then, the prosecutor continued the misdirection by improperly pleading for the jury to administer justice for the victim. Most damning to the notion of fundamental fairness, however, was the prosecutor's explanation of the State's burden of proof: "Your responsibility is to decide the difference between possible and probable." That statement and accompanying argument suggested to the jury that it should acquit Holt if it only believed that he was possibly the shooter but convict him if it believed that Holt was probably the shooter. But, of course, the jury's actual responsibility was to decide whether the State had proved, beyond a reasonable doubt, each and every element of the charged crime.

Diluting the State's burden of proof from beyond a reasonable doubt to a mere probability is a game changer. The majority believes that the prosecutor's misstatement of the law was ameliorated by the pre-2005 version of the burden of proof instruction, PIK Crim. 3d 52.02 (1995 Supp.). I acknowledge that we have avoided finding that instruction to be reversible error, but what does it really tell the jury? The last part of the instruction directs the jury: "If you have no reasonable doubt as to the truth of *any*

of the claims required to be proved by the State, you should find the defendant guilty." (Emphasis added.) One common understanding of "any" in that context would be to read it as "any *one* element." *Cf.* Webster's Third New International Dictionary 97 (1993) ("any" means "one or some indiscriminately of whatever kind"). For instance, if a student were told that he or she could pass a test by correctly answering any of the questions being asked, the student would understand that the minimum passing score would be one correct answer, not correct answers on *all* of the questions. Using that concept of "any," the jury could have convicted Holt if it had no reasonable doubt about any one of the State's claims, *e.g.*, that the murder occurred in Shawnee County, Kansas.

In short, I would not find that the ambiguous burden of proof instruction cured the prosecutor's egregious misstatement of the law on the State's burden of proof. Moreover, the error was exacerbated by the district court's imprimatur. By overruling the defense objection and then allowing the prosecutor to reiterate that the jury's responsibility was to find what was probable, the judge spoke more loudly than the written burden of proof instruction. Certainly, when that error is combined with the other improper statements by the prosecutor, one simply cannot discern a fair trial. Moreover, setting aside the impression that "overwhelming circumstantial evidence" sounds like an oxymoron, I would not find that the quantity and quality of evidence in this case swept away the prejudicial effect of the errors. Rather, I would reverse and remand for a new trial.