NOT DESIGNATED FOR PUBLICATION

No. 113,155

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARK LEWIS GLASGOW,
*Appellant*.

MEMORANDUM OPINION

Appeal from Clark District Court; E. LEIGH HOOD, judge. Opinion filed September 2, 2016. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Clay A. Kuhns*, assistant county attorney, *Allison D. Kuhns*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GARDNER, P.J., BUSER and STANDRIDGE, JJ.

*Per Curiam*: Mark Glasgow appeals his conviction for the rape of S.G., a child under 14 years of age. Glasgow raises three issues. First, he contends the prosecutor committed misconduct during closing arguments by vouching for S.G.'s credibility, attempting to inflame the passions and prejudices of the jury, and diluting the burden of proof by stating an improper definition of reasonable doubt. Second, Glasgow asserts he received ineffective assistance of counsel because his trial attorney failed to investigate the case and present relevant evidence. Finally, Glasgow argues it is necessary to reverse

1

his conviction because the cumulative effect of these errors substantially prejudiced him and deprived him of his right to a fair trial.

Having read the parties' briefs, reviewed the record on appeal, and considered the issues Glasgow presents, we find no reversible error and affirm the conviction.

FACTUAL AND PROCEDURAL BACKGROUND

Glasgow and Edie Haskell have two daughters: K.J.G., who was 16 years old at the time of the incident, and S.G., who was 13 years old. Following their divorce, Edie was granted primary residential custody of the girls with Glasgow receiving occasional visitation. In the summer of 2013, Edie and her daughters resided with Edie's new husband, Marty Haskell, in Coldwater, Kansas. During this time, K.J.G. was closer to Glasgow than Edie, while S.G. was closer to Edie and Marty. In effect, S.G. considered Marty her dad.

According to Edie, during the summer of 2013, K.J.G. mentioned that she wanted to live with Glasgow, which Edie considered a request for more freedom and less responsibility. K.J.G.'s statements upset Edie. Additionally, Glasgow communicated several times to Edie his intent to seek primary residential custody of K.J.G. On one occasion, on July 4, 2013, Glasgow yelled at Edie about it during a telephone conversation. Although Edie never believed Glasgow would actually seek a change in custody, sometime in early- to mid-July 2013, Glasgow filed documents in district court requesting the custodial change.

Prior to Edie's receipt of the custody paperwork, K.J.G. and S.G. spent time with Glasgow and his fiancée, Carrie, in Ashland, Kansas, about 30 miles from Coldwater. When the visit ended, S.G. stayed the night at a friend's house and ultimately returned the evening of July 4, 2013, to Edie's residence. In the early morning of July 5, 2013, Edie's

2

youngest daughter woke her up and told her that S.G. was "acting funny." S.G. had fallen asleep on the couch after Fourth of July festivities and, upon checking her, Edie discovered that S.G. was having a nightmare.

According to Edie, S.G. was yelling, "Stop it, don't touch me, leave me alone," and she was "crying, kicking, [and] fighting with the couch." When Edie attempted to wake S.G., she said, "He hurt me, momma, he hurt me." Edie asked S.G. what she meant and who had hurt her, and S.G. replied, "My dad." S.G., who was not yet fully awake, told Edie that Glasgow touched her vagina during her last visitation with him. Within 15 minutes of learning about the abuse, Edie contacted the police, without discussing S.G.'s allegations with Glasgow.

On July 10, 2013, Jamie Peralta, a deputy with the Clark County Sheriff's Office, received a report of child sexual abuse from Comanche County. Deputy Peralta contacted Edie who told him about S.G.'s nightmare. A few days later, the deputy interviewed S.G. According to Deputy Peralta's testimony at trial:

> "[S.G.] said that her and her father had gone out because Mark Glasgow had asked if she wanted to go to the lake and that he would let her drive. Being a young teenager, she said that she liked driving so she went out with him and they drove up County Road 20, which takes you up to the lake from Ashland. They got there, she said they drove around for approximately 15 to 20 minutes. And as they were driving around, . . . she described it as . . . the southeast part of the lake around the dam, she said that she remembers going down a very steep hill. When she got there, [Glasgow] had asked her—or told her to shut the car off.
>
>    . . . .
>
> ". . . She said that once she got there and that they had parked, [Glasgow] had told her to pull her pants down. [S.G.] said that—as [S.G.] was saying this, [S.G.] began to—her demeanor was starting to change. She was getting really upset, kind of closing herself and guarding herself, became really emotional, crying. She said that she asked

3

him why and that [Glasgow] had told her that she had brought this on herself because of the way she dresses wearing spandex and sport bras all the time.

    . . . .

"[S.G.] stated that [], after she questioned why, [Glasgow] told her that she better do it otherwise he was going to kill her, [S.G.], and her mother. [S.G.] said that she was afraid that he would do this so she pulled . . . her pants and her panties down.

    . . . .

". . . She said that she was wearing white and black Nike running shorts and a gray cut-off t-shirt.

    . . . .

"She was a little confused on the date, but she believes it was around the 26th or 27th of June, 2013.

    . . . .

". . . [S.G.] said that after she pulled down her shorts, that [Glasgow] was in the front passenger seat and had supported himself with his left hand on the center console, reached over with the right hand and then touched her.

    . . . .

"[S.G.] said that she was real emotional and began to cry, and she leaned her head back and was crying but she said that at one point she did look down while this was happening and [saw] the palm of Mark Glasgow's hand, which had a burn on it . . . .

    . . . .

"She referred to it as her private area. And when I asked her what she meant by that, she again started crying and she stopped talking for a few minutes and then asked if she could tell her mother where he had touched her. I asked her if she could just tell me, it would be easier, and she said below her waist. . . .

    . . . .

"After she—I asked her to describe more of what had happened and [S.G.] said that as he was doing this, I asked her if she knew what it was, she began crying and stated that she did not want to know . . . .

    . . . .

"She said that she had heard from friends in school that it was called being fingered. She started crying again, uncontrollably, and saying that she does not want to understand this. She didn't want to know what that was and didn't want to understand it. I

asked her at that point if there was any penetration and . . . she said: 'Oh, yeah, it felt like his whole hand.'

. . . .

". . . [S.G.] began crying again and said that it was very painful, and she said—described the pain as somebody grabbing her skin and stretching it.

. . . .

"After this, [S.G.] said that she was crying and was hoping that this was a bad dream and that she just wanted to ball up and cry and she wanted her mother. [S.G.] said that after [Glasgow] stopped touching her vagina, that he had reached over and grabbed her chest. I asked her what she meant by her chest or what part and she said: My boobs.

"After that, [S.G.] said that [Glasgow] told her that you better not tell anybody or I will kill you and your mother. [S.G.] then pulled her shorts back up and [Glasgow] drove the rest of the way [back to Ashland] because she had a [softball] game."

At trial, S.G.'s testimony regarding the abuse was similar to the account provided to Deputy Peralta during the interview.

Later the same day as Deputy Peralta's interview with S.G., he contacted Glasgow who voluntarily came to the sheriff's office. According to the deputy, he asked Glasgow if he knew why he was at the sheriff's office. Glasgow stated that he believed it was related to his custody battle with Edie and that "she was just trying to make him look bad." Deputy Peralta then asked Glasgow what had happened on the trip to the lake, and Glasgow, "whose demeanor was showing that he was getting nervous," stated, "I have never hurt my children or done anything sexual with my children." According to Deputy Peralta, he had not yet informed Glasgow about S.G.'s allegations of sexual abuse. Glasgow then acknowledged that he recently had permitted S.G. to drive to the lake with him because he was teaching her to drive. After S.G. drove around the lake for about 20 minutes, they remembered she had a softball game, so he drove her to the game.

At this point, Deputy Peralta informed Glasgow that S.G. had accused him of sexual abuse. According to the deputy, Glasgow "kind of looked down and . . . he was

5

starting to breathe a little bit heavier. He was kind of quiet for a second and then he said he's never done anything sexual to any of the daughters." Glasgow stated that he would never do anything sexual with his children and that "even if he had tried to pull down her panties, S.G. would put up a fight." Later, Deputy Peralta noticed that Glasgow had scarring on his right hand, which Glasgow advised had occurred when he burned his hand while repairing a water heater.

On August 16, 2013, Terri Trent, a social work specialist for the State of Kansas Department for Children and Families (DCF), conducted a forensic interview with S.G. at the Meadowlark House, a child advocacy center. The jury viewed a DVD recording of the interview. Trent stated that S.G. appeared to be a bright and intelligent young lady, and when she started talking about the abuse, she got upset, started to cry a little bit, put her head down, and just seemed kind of withdrawn and a little more closed off. Based upon her demeanor, Trent concluded that talking about this subject was difficult for S.G.

On August 21, 2013, Leigh Schoen, a nurse practitioner in internal medicine and pediatrics at the Dodge City Medical Center, performed a non-acute sexual abuse examination of S.G. Nurse Schoen did not find any physical evidence of abuse during S.G.'s examination, but she indicated that she does not expect to find such evidence during a non-acute examination. Moreover, Nurse Schoen explained that it is "very well accepted in medicine that the majority of child sexual abuse exams would be normal."

Shortly thereafter, Deputy Peralta asked Glasgow for an additional interview. After Glasgow waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), Deputy Peralta advised Glasgow that S.G. had recently submitted to a forensic interview and a medical examination. At some point Deputy Peralta told Glasgow that he had evidence against him. According to the deputy, upon hearing about the medical examination, Glasgow got upset and said there was no way to tell from a medical exam if somebody had been penetrated. According to Deputy Peralta:

6

"[Glasgow] said that he doesn't get sexually aroused by his children. And he stated just look at K.J.[G.], she's the older guys' magnet . . . . And at this point, he was becoming upset and started clenching his fists and started yelling at me saying I was a liar and a manipulator and at that point [Glasgow] . . . asked for a lawyer . . . and he was let go."

Deputy Peralta's interviews with Glasgow were not recorded.

At trial, Glasgow and Carrie testified for the defense. Glasgow testified that although he had a very good relationship with K.J.G. prior to the charges in this case, his relationship with S.G. had ebbed and flowed over the years. According to Glasgow, in the summer of 2013, his relationship with S.G. was kind of strained because she knew that he was going to try to get custody of K.J.G., and Glasgow felt like S.G. was there like a spy because she told her mom everything that went on in his house. Glasgow said that Edie was manipulating S.G.'s opinion of him and that S.G. heard what her mom wanted her to hear, including bad stuff about him.

According to Glasgow, on June 17, 2013, S.G. approached him and asked, "Daddy, can I drive?" Glasgow let S.G. drive quite a bit as a form of entertainment, so he decided to allow her to drive on country roads to the Clark County Lake. The drive typically took 30 to 35 minutes. At the time, neither Glasgow nor S.G. had valid driver's licenses. Glasgow took his child (1 year of age) and his dog along for the drive. According to Glasgow, they were gone "[j]ust long enough to go out there, drive around, and come back" because S.G. remembered that she had a softball game. Glasgow, acknowledged, however, that they stopped for a short time near the dam while he told S.G. that his oldest children had played there, and he reminisced about his son who had recently died.

Glasgow emphatically denied asking S.G. to pull down her shorts or touching her inappropriately: "All I know is I am innocent. I did not do this. I did not commit any

7

kind of sexual abuse towards [S.G.], I promise." Glasgow testified that S.G. was a liar; when asked why S.G. would make false allegations against him, Glasgow replied, "She has motives." Glasgow also maintained that Deputy Peralta, who Glasgow described as a bully, was lying about his claim that Glasgow denied touching or hurting his children prior to being advised of S.G.'s accusations: "I don't volunteer something I don't know."

Carrie testified that she married Glasgow in September 2013, after he was charged in this case, and the couple had two children. Carrie maintained that while Glasgow was very close with K.J.G., his relationship with S.G. had gotten progressively worse. According to Carrie, in January 2012, S.G. called Glasgow and told him she hated him and wanted nothing to do with him. Likewise, S.G. frequently told Glasgow that she did not want him to be her dad. Carrie noted that S.G. knew of the plans to seek a custody change for K.J.G. because on June 19, 2013, she and Glasgow drove the two girls to Edie's house for a birthday party. On the way over to the party, Carrie and Glasgow talked to K.J.G. in the car about filing for custody and having K.J.G. move back in with them; S.G. was also in the car.

Carrie testified that upon S.G.'s return from the lake drive, she did not act differently towards Glasgow and her demeanor was the same as always. Carrie recalled that S.G. went out with her friends and then went to bed early, in keeping with her usual routine. According to Carrie, S.G. stayed with them until June 29, when she went home to spend the Fourth of July with Edie and Marty. Prior to leaving, however, S.G. asked Carrie if they would come and get her after the Fourth because K.J.G. planned to stay in Ashland until July 8, and S.G. wanted to spend a few more days with them.

At the conclusion of trial, on May 22, 2014, the jury found Glasgow guilty of rape, an off-grid person felony, in violation of K.S.A. 2012 Supp. 21-5503(a)(3) and (b)(2).

On September 10, 2014, Glasgow appeared for sentencing with new counsel. Glasgow testified in mitigation of his sentence and in support of his motion for a durational and/or dispositional departure. Glasgow informed the district court that his previous counsel, Louis Podrebarac, had failed to properly impeach S.G.'s credibility:

"I was not represented well in this trial. I was railroaded. And I feel like my life is just screwed up because a little girl wants to lie about something because she's mad at me because I had the gall to take her sister that wanted to come live with me. And none of this came about until after that fact."

The district court denied Glasgow's motion for a departure sentence and imposed the presumptive sentence under Jessica's Law—lifetime imprisonment with no possibility of parole for 25 years.

Glasgow timely appealed. Subsequently, our court granted Glasgow's request for a remand to allow the district court to determine whether Glasgow was denied his statutory right to effective assistance of counsel at trial, consistent with the Kansas Supreme Court's ruling in *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986). Following an evidentiary hearing, the district court ruled that Glasgow had failed to prove that Podrebarac provided constitutionally deficient representation. Glasgow then filed a timely supplemental notice of appeal.

PROSECUTORIAL MISCONDUCT

On appeal, Glasgow contends the State committed prosecutorial misconduct during closing arguments. In particular, Glasgow argues that the prosecutor improperly vouched for S.G.'s credibility by arguing that S.G. would not lie, attempted to inflame the passions and prejudices of the jury by eliciting sympathy for S.G., and by demonizing him. Glasgow also claims the prosecutor engaged in misconduct when he attempted to

9

define reasonable doubt. In order to provide context, we restate portions of the prosecutor's argument and italicize those remarks challenged by Glasgow.

In the prosecutor's initial closing argument he said:

"Defense counsel wants you to believe that this was a bad dream, that that's all this was, that none of this ever happened. But Edie Haskell testified that [S.G.] woke up from a bad dream and she was dreaming about it, a horrific event, but she woke up from that dream and told her mother what happened, and her mother called law enforcement and she told all these other people what had happened. Can you imagine the trauma? *You can't imagine the trauma that she went through in having to repeat this story over and over.* [S.G.] told Deputy Peralta what happened in detail, including the things that [Glasgow] said to her. One of those things was: You deserve this. You deserve this because of the way you're dressing. This was a 13 year old girl.

"[S.G.] told Terri Trent what happened to her. You saw the interview. Same thing, [Glasgow] told her you deserve this. *His intent was to humiliate her and to show his power and control that he had over her, and he did that.* She told Leigh Schoen what happened to her. And Leigh Schoen, who's done numerous, hundreds of these investigations, told you that her reactions to this event are just what would be expected of a child in this situation.

"[Glasgow]—we told you from the beginning, . . . *Glasgow . . . had to show his control. And in the process to maintain that control, he had to show total humiliation—or make her feel total humiliation and he did that.* He raped his daughter with his finger when she was 13 years old and told her it was because of the way she was dressed. He threatened her. She said that over and over. Now, it may not have been in the exact words, but she was threatened. She felt her mother was threatened and she had no reason not to believe him when he told her that. She was scared and humiliated. Just what he wanted. And she didn't tell anyone what happened for days. And that's been testified to, that's not uncommon. She never intended to tell anyone because of the humiliation and the shame.

"But when she woke up from that bad dream, she had to tell, she couldn't keep it in any longer. *She had to tell someone she could trust and her mother was there for her, someone that she knew would believe her* and her mother was there.

10

"*You watched* [*S.G.*] *testify, you can tell that she is still traumatized by the events. You could see the trauma on the DVD.* You could tell it from conversations—or from the testimony of Deputy Peralta, from the testimony of Leigh Schoen. *She told you she is trying to forget what happened but she can't.* She said this plays through her mind all the time. It distracts her from her daily activities. *This child is 14 years old. She is going to be dealing with this for the rest of her life probably, but he showed her. That is just what he wanted.*

"*Think about this, why would she lie to you about this*? *Why would she put herself through this*? *The continued trauma, the continued humiliation, telling what happened to her to a room of strangers*. She told this to several professionals: The law enforcement, Terri Trent, Leigh Schoen, and to you. *Why would she put herself through that if it didn't happen*?

"*You saw how this still affects her. You can expect that she is not going to remember all the details clearly*. And in a different telling of the story, there were some inconsistences in some of the details. But you heard Leigh Schoen testify that that's not uncommon. That is part of the humiliation, part of the whole trauma of this event, and *that is part of what he wanted, to make sure that this was so traumatic that it was going to affect her.*

"[S.G.] told Leigh Schoen that her father finger raped her, that it hurt, that he put his finger in her vagina. *Can you imagine how hard that was to do*? When she talked to Deputy Peralta, which was closer to the actual event, she gave more detail and you heard his testimony of what he told her. And the details that she told Deputy Peralta were probably fresher in her mind and more detailed than maybe some of the statements she made later, including while she was on the stand here, because as she said, she'd been trying to put this out of her mind for the last nearly 11 months.

. . . .

"You saw how hard it was for her to testify, you heard from each of the other witnesses how hard it was for her to tell them what happened. Even when she was talking with Terri Trent in a safe environment up at Meadowlark House. Think about this, *how devious and wicked would this young girl be in order to make up a story like that and tell you that story in this Court.*

"Why should you believe her? *First of all, why would she lie*? *What reason would she have to come here and perjure herself*? To get out of visitation with her father? Really? That's what [Glasgow] wants you to believe. The testimony has already been, the

visitation was pretty much whenever the kids wanted and as [Carrie] said, she had already been there several times that summer. She visited him when she wanted to go. We don't know—you know, I know she is busy with other activities. She probably did not go as often as her sister, but to make up a story like this to get out of visitation? Really? *Why would anyone put themselves through this trauma*? *Why would anyone go through what she went through yesterday if it wasn't the truth*? And her testimony was corroborated by the other witness who testified:  By her mother, by Terri Trent, by Leigh Schoen, by Deputy Peralta. They all heard what she told them what happened and they all got to see the traumatic effect that that had on her.

. . . .

"*If* [*S.G.*] *is lying to you, why didn't she exaggerate it*? *Why didn't she have a better story than she had*? *The inconsistencies in her story, the inconsistencies in the telling, are consistent with the traumatic event that she went through and her attempt to forget what happened to her.*

. . . .

"[Glasgow] also was trying to tell you that she made up this story because she is being manipulated by her mother because he's wanting custody of her older sister. He wants you to believe she made up this story because of the custody battle. Really? Really? *She would put herself through this for that*?"

During the State's rebuttal argument, the prosecutor said:

"Mr. Podrebarac spent a lot of time again trying to convince you how important the exact date that this occurred is, taking your mind off of why we are here. The time period is important, but because of *the fear and the humiliation that* [*S.G.*] *was feeling, she had no intention to tell anybody at any time what happened to her, which is just what he wanted*. But finally, when she had that nightmare and her sister got her mom involved, she had to tell somebody. And once she told somebody, she told a consistent story, not every detail, but imagine the trauma that she was under and we have been through that before."

Additionally, Glasgow complains that during the rebuttal argument the prosecutor improperly diluted the State's burden of proof when he attempted to define reasonable doubt:

> "When we selected you as jurors, when you agreed to be jurors, you agreed that if the State met its burden of proof beyond a reasonable doubt, not beyond all doubt, don't let Mr. Podrebarac or anyone else tell you this is: I have got to be convinced by all doubt. *Reasonable doubt means if a reasonable person would believe beyond a reasonable doubt that these events occurred, then you must find* [*Glasgow*] *guilty*. You weren't there, I wasn't there, you didn't go to the moon. Do you have any reasonable doubt that we weren't there?"

In our analysis of a prosecutorial misconduct claim, we are guided by the following standard of review: Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury requires a two-step analysis. First, the appellate court determines whether the comments were outside the wide latitude afforded a prosecutor in discussing the evidence. Second, if the comments were improper and constituted misconduct, the appellate court must determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015).

Of note, at trial, Glasgow did not object to the prosecutor's closing remarks which he now challenges on appeal. But a claim of prosecutorial misconduct based on comments made during voir dire, opening statements, or closing argument may be reviewed on appeal even when a contemporaneous objection was not made at the trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200, *cert. denied* 133 S. Ct. 529 (2012).

In applying our standard of review, we will first individually consider whether the three separate claims of improper closing argument constitute misconduct. We will then consider if any instances of misconduct prejudiced Glasgow.

13

*Vouching for S.G.'s Credibility*

Glasgow claims the prosecutor's comments that S.G. lacked a motive to fabricate the sexual abuse allegation improperly vouched for S.G.'s credibility and was speculative opinion that fell outside the bounds of proper argument. The State counters that the prosecutor did not vouch for S.G's credibility because he did not provide a personal opinion about the witness.

It is well-settled law that a prosecutor may not provide the jury with a personal opinion regarding the credibility of witnesses. *State v. Stone*, 291 Kan. 13, 19, 237 P.3d 1229 (2010) (quoting *State v. McReynolds*, 288 Kan. 318, 325, 202 P.3d 658 [2009]). Prosecutors are prohibited from expressing credibility opinions because "'such comments are "unsworn, unchecked testimony, not commentary on the evidence of the case."' [Citations omitted.]" *State v. Peppers*, 294 Kan. 377, 396, 276 P.3d 148 (2012). See Kansas Rules of Professional Conduct (KRPC) 3.4(e) (2015 Kan. Ct. R. Annot. 609) ("A lawyer shall not: . . . [e] in trial, . . . state a personal opinion as to . . . the credibility of a witness.").

Nevertheless, prosecutors have wide latitude to craft arguments which draw reasonable inferences from the evidence, and this latitude includes explaining "'''to juries what they should look for in assessing witness credibility,''' [provided t]he jury [is] left to draw the ultimate conclusions. [Citations omitted.]" *State v. Hart*, 297 Kan. 494, 505-06, 301 P.3d 1279 (2013). In other words, prosecutors are guilty of misconduct only if they provide the jury with their personal opinion on a witness' credibility. Comments that merely explain "some of the legitimate factors" the jury can consider in assessing credibility fall within the wide latitude afforded prosecutors in discussing the evidence. *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008); see *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011).

Glasgow does not identify any remark by the prosecutor which he asserts constitutes an impermissible personal vouching for S.G.'s credibility. Moreover, our review of the challenged comments did not reveal any personal vouching for S.G.'s credibility by the prosecutor. Glasgow's principal complaint is that the prosecutor's comments directed the jury's attention to impermissible reasons why the jury should believe S.G.'s testimony. As recounted earlier, these reasons included (1) rhetorical questions asking why, if S.G. was lying, would she undergo the trauma of repeated questioning (prior to and during trial) about the incident; and (2) suggesting that if S.G. was lying she would have had a better story without inconsistencies.

In our view, the comments Glasgow claims were objectionable do not constitute prosecutorial misconduct. The prosecutor was explaining some of the appropriate factors the jury could consider in assessing witness credibility, and he advocated for reasonable inferences the jury could draw from the evidence. See *State v. Scott*, 286 Kan. 54, 83, 183 P.3d 801 (2008) ("It is improper for a prosecutor to 'vouch' for the credibility of a witness," but "it is not improper for a prosecutor to argue that of two conflicting versions of an event, one version is more likely to be credible based on the evidence.").

Glasgow's defense was to attack S.G.'s credibility and convince the jury that after concocting her false allegations in a dream, S.G. lied by dishonestly accusing Glasgow of sexual abuse due to the ongoing custody dispute and associated familial discord. Defense counsel, noting that S.G. cried on the stand, suggested this could mean that she had told a story that had "snowballed." In response to this defense theme, the prosecutor discussed factors the jury should consider in assessing S.G.'s credibility without offering his personal opinion as to S.G.'s veracity. The technique the prosecutor employed was to ask the jury rhetorical questions about S.G.'s motivation to lie about such a serious crime.

The jury personally observed the demeanor of S.G. in the courtroom. It also viewed her behavior during the Meadowlark House interview and heard Deputy Peralta's

15

description of her reactions to his questions. On each occasion that S.G. related facts about the sexual abuse, it is apparent the young girl exhibited considerable difficulty in discussing this event. Given this factual foundation, the prosecutor's rhetorical question asking why, if S.G. had purposefully lied about her abuse, she would persist in submitting to repeated interviews and testimony about private sexual matters was not an improper argument. On the contrary, it was one factor of many for the jury to consider in evaluating the young girl's motivation to report the abuse. See *Chanthaseng*, 293 Kan. at 143 (prosecutor described victim as "*a credible witness*" based on her demeanor exhibited during her pretrial interview recorded on DVD and her courtroom testimony).

Our Supreme Court permitted the rhetorical question technique in *State v. Ortega*, 300 Kan. 761, 775, 335 P.3d 93 (2014), and found the following remarks did not constitute prosecutorial misconduct:

> "'The defendant obviously has a reason for shading the truth in her direction; she doesn't want to be convicted of any crimes. But remember, witnesses came in here and they testified that they saw the defendant, they knew it was her, and they knew that she said these things. What reason do they have to lie to you? Perhaps somebody who might think, well, police officers do this all the time. I don't necessarily know why you would think that, but that's the most cynical possible thing I can think of. Well, set that aside. Do middle school secretaries come into court and lie all the time? Did Ms. Perez or Ms. Delarosa, the principal, have a reason to come in here and tell you that the defendant did something or said something that she didn't really do?'"

Our Supreme Court found these statements were within the wide latitude afforded prosecutors and explained: "The prosecutor merely asked rhetorical questions that probed whether there was any motivation for the school employees to lie. Examining whether a witness has a motive to lie is a valid consideration in weighing credibility." 300 Kan. at 777.

16

Moreover, throughout his closing argument, the prosecutor discussed the evidence presented at trial while reminding the jury of the court's instruction on assessing credibility:

> "[Glasgow] wants you to believe that [S.G.]'s lying about all of this, that she's just making it up, that she had a bad dream. *You watched her. As the Judge stated and instructed you in Instruction Number 4*:  *It is for you to determine the weight and credit to be given the testimony of each witness. You have the right to use common knowledge and experience in regard to the matter about which a witness has testified. And that's what you will do.*" (Emphasis added.)

Our court has addressed a case factually similar to the present case in *State v. Anderson*, No. 111,061, 2015 WL 3555353, at *2-3 (Kan. App. 2015) (unpublished opinion), *rev. denied* 303 Kan. ___ (February 9, 2016), where our court did not find any misconduct when the prosecutor argued:

> "'Now, what you've heard is from multiple people who told you that they responded to that house at 2:30 in the morning. Now, ask yourself this because you're given that instruction in instruction number four to use your common sense. This was an immediate disclosure. *What child who makes this up wakes up in the middle of the night and just all of a sudden decides to make this disclosure and call the police out? Does that meet your common sense test or does that lend credibility to what she's saying?*
>
> "'**Why? Why would she make it up? She was living with her mom at the time; you've heard she's now not living with her mom. What does she gain out of this? What does she gain? She gains nothing out of this. Her life has been disrupted.**
>
> "'*What you have, the evidence that you have is a little girl who did the right thing.* Someone hurt her, she went and took action, the police were called, a report was made. . . .
>
> "'*What does she have to gain by making this up? And by the way, think about this, if somebody's making a story up, do they say oh, it was just a touching or does she say something like he inserted his finger in me or he grabbed my breasts or . . . he raped me?*

17

"'*I mean if you're going to make something up, you go the distance, right? If we're trying to get somebody in trouble, we say the worst possible thing that we could say, right?*

"'Common sense and experience, ladies and gentlemen, use that common sense, look at those circumstances, listen to the testimony . . . and find [the defendant ] guilty as charged.'"

In the present case, as in *Anderson*, the prosecutor's remarks were in response to the defense theory that the young victim made up the account of her sexual abuse. Under these circumstances, the prosecutor's positing of rhetorical questions challenging the improbability of motives that S.G. may have had to lie about the abuse was not improper. It was also not improper for the prosecutor to emphasize S.G.'s demeanor and resilience during the pretrial interviews and her courtroom testimony as indicative of her credibility. Accordingly, the challenged comments do not rise to the level of prosecutorial misconduct because they are within the wide latitude given to prosecutors in discussing evidence.

*Inflaming the Passions and Prejudices of the Jury*

Next, Glasgow claims the prosecutor improperly inflamed the passions and prejudices of the jury by eliciting sympathy for S.G. while demonizing him. According to Glasgow, the prosecutor sought to achieve these goals by emphasizing that S.G. was going to live with the effects of the crime for the rest of her life, while stressing that Glasgow's purported malevolence was shown in his intent to humiliate his daughter and make sure the event was traumatic.

It is a prosecutor's duty to "'ensure only competent evidence is submitted to the jury and avoid arguments that could prejudice the jurors' minds.'" *State v. Duong*, 292 Kan. 824, 834, 257 P.3d 309 (2011). Thus, "[a] prosecutor may not encourage the jury to decide a case based on a personal interest instead of neutrality or distract the jury from its

18

duty to make decisions based on the evidence and the controlling law. [Citation omitted.]" *State v. Fisher*, 304 Kan. 242, 254, 373 P.3d 781 (2016). As our Supreme Court stated in *State v. Majors*, 182 Kan. 644, 648, 323 P.2d 917 (1958):

"Although an attorney may indulge in impassioned bursts of oratory or may use picturesque language as long as he introduces no facts not disclosed by the evidence, he is bound to remember that he is an officer of the court, that his liberty of argument must not degenerate into license, and that he should always be decorous in his remarks to the extent that they do not impair administration of justice. [Citations omitted.]"

Of particular relevance to this appeal, our Supreme Court has held that it is improper for a prosecutor to encourage the jury to base its decision "on sympathy for the victim or victim's family or to otherwise argue the impact of a crime." *State v. Simmons*, 292 Kan. 406, 419, 254 P.3d 94 (2011).

In this case, the prosecutor emphasized the trauma associated with the sexual abuse and argued that Glasgow's intent was to cause fear and humiliation in S.G. Unless there was some factual basis and evidentiary purpose in making these comments, the prosecutor's arguments could be viewed as inflammatory. When read in context, however, we are persuaded the prosecutor's arguments related to the trial evidence and were intended to counter Glasgow's defense that S.G. had lied about the sexual abuse. Several reasons support our conclusion.

First, there was considerable evidence that S.G. was traumatized by the sexual abuse. S.G.'s nightmare triggered the criminal investigation. Deputy Peralta, Nurse Schoen, and Trent all testified about the emotional toll S.G. exhibited (in some cases weeks after the incident) while recounting the abuse. At trial, almost 1 year after the abuse, S.G. cried on the witness stand while describing the events which occurred at the Clark County Lake.

Second, there was evidence that Glasgow intended to cause fear and humiliation in his young daughter. S.G. testified that Glasgow threatened to kill Edie and Marty if she did not pull down her pants. Deputy Peralta testified that S.G. told him that Glasgow threatened to kill her and her mother if she told anyone about the sexual abuse. The jury also heard testimony from Deputy Peralta and Nurse Schoen that S.G. said Glasgow told her "she had brought this on herself because of the way she dresses wearing spandex and sport bras all the time."

Not only was there a factual basis for the prosecutor's argument, there was also a valid evidentiary purpose. As noted earlier, Glasgow's defense was to attack S.G.'s credibility and suggest that she concocted her false allegations. In support of this defense, Glasgow presented evidence that after the purported sexual abuse, S.G. went home and did not promptly report the incident to her mother or anyone. Moreover, Carrie testified that after the claimed incident S.G. was anxious to return to her father's home. The defense also attacked S.G.'s inability to remember certain aspects of the incident and her inconsistencies in relating various accounts of the abuse.

The trauma and humiliation exhibited by S.G. was relevant to attack these aspects of Glasgow's defense. In the State's view, S.G.'s failure to promptly report the abuse was because of Glasgow's threats of violence against S.G. and her mother. Moreover, the State theorized that because of S.G.'s humiliation and trauma she had difficulties with memory and inconsistencies in her accounts of the rape. This latter argument by the prosecutor was supported by the testimony of Trent that it is common for child victims of sexual abuse to try to forget the abuse.

We conclude the challenged comments were not designed to inflame the passions and prejudices of the jury. Rather, the prosecutor's arguments were based on permissible inferences derived from trial evidence which countered the defense theory that S.G. had lied about the rape.

20

*Diluting the Burden of Proof*

For his third claim of prosecutorial misconduct, Glasgow objects to the prosecutor's definition of reasonable doubt: "Reasonable doubt means if a reasonable person would believe beyond a reasonable doubt that these events occurred, then you must find [Glasgow] guilty." According to Glasgow, this definition diluted the State's burden of proof because it "allowed a juror to convict based upon what 'a reasonable person would believe' a conclusion that could be reached based upon the thoughts and conclusions of other jury members, i.e., groupthink, and not upon a personal decision that the State had met its burden to the satisfaction of an individual juror."

The State counters that the prosecutor's definition provided during his rebuttal argument was "in conformity with the acceptable definition . . . because it merely adds the word 'reasonable' before the actual accepted definition."

Glasgow's complaint has merit. The prosecutor committed misconduct when he described reasonable doubt in the context of a "reasonable person" rather than stating the appropriate language found in PIK Crim. 4th 51.010, which references "you" (the juror) rather than a "reasonable person." Kansas law is clear:

> "Any attempt to lower the burden of proof—*or even to define reasonable doubt*—is
> misconduct. See *Magallanez*, 290 Kan. at 914 ('[P]rosecutors embellish on the definition
> of the burden of proof in criminal cases at their peril.'); *State v. Walker*, 276 Kan. 939,
> 956, 80 P.3d 1132 (2003) ('"Efforts to define reasonable doubt, other than as provided in
> PIK Crim. 3d 52.02 [now PIK Crim. 4th 51.010] [burden of proof, presumption of
> innocence, and reasonable doubt], usually lead to a hopeless thicket of redundant phrases
> and legalese, which tends to obfuscate rather than assist the jury in the discharge of its
> duty."')." (Emphasis added.) *State v. Holt*, 300 Kan. 985, 1004, 336 P.3d 312 (2014).

21

While we question Glasgow's claim that the prosecutor's reference to a reasonable person rather than an individual juror somehow diluted the State's burden of proof, our law is clear in prohibiting any modification to the reasonable doubt formulation found in PIK Crim. 4th 51.010. Accordingly, we find the prosecutor's misstatement was error.

Having found misconduct, it is necessary to address the second step of the prosecutorial misconduct analysis. In this step, appellate courts consider three factors:

"'(1) whether the misconduct was gross and flagrant; (2) whether it was motivated by prosecutorial ill will; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors.' No one factor is controlling. [Citations omitted.]

"Before the third factor can ever override the first two factors, an appellate court must be able to say that the State can meet the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). [Citations omitted.]" *State v. Williams*, 299 Kan. 509, 540-41, 324 P.3d 1078 (2014).

Under the constitutional harmless error test, the party benefitting from any prosecutorial misconduct must prove beyond a reasonable doubt that the error "'will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 299 Kan. at 541. Under the statutory harmless error standard, the court must determine whether "'there is a reasonable probability that the error did or will affect the outcome of the trial in light of the entire record.' [Citation omitted.]" 299 Kan. at 541.

*Gross and Flagrant Misconduct*

Was the misconduct gross and flagrant? "In determining whether prosecutorial misconduct was gross and flagrant, among the things an appellate court considers are

22

whether the comments were repeated, emphasized improper points, were planned or calculated, violated well-established or unequivocal rules, or violated a rule designed to protect a constitutional right. [Citations omitted.]" *State v. Crawford*, 300 Kan. 740, 752, 334 P.3d 311 (2014).

By modifying the language of the reasonable doubt test, the prosecutor's statement in this case ran afoul of a long-standing, well-established rule of law that the wording of the reasonable doubt test should not be altered. See *Holt*, 300 Kan. at 1004. Nevertheless, we are not confronted with the typical scenario wherein a prosecutor uses analogies or metaphors that weaken the State's burden of proof. See *Crawford*, 300 Kan. at 755 (finding gross and flagrant misconduct where prosecutor ignored "consistent warnings in Kansas precedent" to avoid using puzzle analogies to define reasonable doubt). In further mitigation, the prosecutor did not repeat his "reasonable person" reference as part of the reasonable doubt formulation.

Finally, it appears the prosecutor's statements were not planned or calculated; instead, the statements were "spur-of-the-moment comments delivered extemporaneously under the stress of countering a defense argument." See *State v. Marshall*, 294 Kan. 850, 863, 281 P.3d 1112 (2012). In particular, the prosecutor was attempting to respond to defense counsel's extensive argument and use of a demonstrative exhibit to illustrate that the standard of proof, beyond a reasonable doubt, is the highest level of proof in the law. Immediately prior to the prosecutor's challenged comment, the prosecutor said, "[D]on't let Mr. Podrebarac or anyone else tell you this is:  I have got to be convinced by all doubt." The prosecutor then emphasized that the State's burden of proof was beyond a *reasonable* doubt.

Our Supreme Court has held that "a prosecutor's improper comment or argument can be prejudicial, even if the misconduct was extemporaneous and made under the stress of rebutting arguments made by defense counsel." *Marshall*, 294 Kan. at 861.

23

Nevertheless, our Supreme Court has specifically noted that an appellate court may consider the extemporaneous, rebuttal nature of a prosecutor's statement when considering prejudice. 294 Kan. at 861-64; see *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015) ("'The extemporaneous, rebuttal nature of a prosecutor's argument is merely a factor to be considered by an appellate court.' [Citations omitted.]").

After considering all of the factors, we are persuaded the prosecutor's substitution of "reasonable person" rather than "you" (the juror) was not gross and flagrant misconduct.

*Ill Will*

Glasgow argues that given the intentional nature of the prosecutor's misconduct our court may presume ill will. We disagree. "[A] prosecutor's ill will is usually 'reflected through deliberate and repeated misconduct or indifference to a court's rulings.' [Citations omitted.]" *State v. Inkelaar*, 293 Kan. 414, 430, 264 P.3d 81 (2011); *State v. Miller*, 284 Kan. 682, 719, 163 P.3d 267 (2007). There is no evidence in this record suggesting that ill will motivated the prosecutor. On the contrary, his substitution of "reasonable person" for "you" (the juror) seems to be inartful language spoken as a "result of the extemporaneous nature of the [remark rather] than a planned attempt to dilute the State's burden of proof." See *Holt*, 300 Kan. at 1004. We find no ill will.

*Overwhelming Nature of the Evidence*

The third and final factor to consider is whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. Glasgow deemphasizes the strength of the trial evidence, simply noting that the case rested upon S.G.'s word. The State counters that not only was the victim's

24

story consistent when she told her mother, the deputy, the forensic interviewer, the nurse practitioner, and the jury, but also that the defendant made implicitly inculpatory statements.

We think the State has the better assessment of the evidence. S.G.'s abuse was revealed as a result of a nightmare which was corroborated by family members. The one long trip to Clark County Lake was corroborated by Glasgow and Carrie. S.G. provided eyewitness testimony to the abuse. Her subsequent interviews were fairly consistent with her courtroom testimony. Glasgow's nervous demeanor when asked by Deputy Peralta what had happened on the trip to the lake and his spontaneously volunteered statement of "I have never hurt my children or done anything sexual with my children" before the deputy informed him of S.G.'s allegations was circumstantial evidence of Glasgow's guilty knowledge. Considered in its totality, we view the direct and circumstantial evidence of Glasgow's guilt to be substantial.

Importantly, notwithstanding the prosecutor's error during argument, the trial court properly instructed the jury on the correct burden of proof and reasonable doubt formulation using P.I.K. Crim. 4th 51.010. "This court presumes the jury followed the trial court's instructions, and it may be concluded that the court's guidance served to mitigate any potential harm caused by the prosecutor's statements." *Holt*, 300 Kan. at 1005; see *State v. Huddleston*, 298 Kan. 941, 956, 318 P.3d 140 (2014) ("Although these instructions do not give the prosecutor a free pass on misconduct, they are appropriate considerations when evaluating whether a jury was misled."); *State v. Bunyard*, 281 Kan. 392, 406, 133 P.3d 14 (2006) (prosecutor's misstatement of law may be considered in context of jury instructions provided by court), *disapproved on other grounds by State v. Flynn*, 299 Kan. 1052, 329 P.3d 429 (2014).

All things considered and applying the constitutional harmless error test, we conclude the State has shown beyond a reasonable doubt that the prosecutor's error did

not affect the outcome of the trial in light of the entire record, and there is no reasonable possibility that the error contributed to the verdict. See *Williams*, 299 Kan. at 541.

INEFFECTIVE ASSISTANCE OF COUNSEL

For his last issue on appeal, Glasgow contends he was not provided with constitutionally effective assistance by his trial counsel. As mentioned earlier, after Glasgow filed his notice of appeal, our court remanded the case to permit the district court to conduct a *Van Cleave* hearing to determine this issue. The hearing was held on April 21, 2015. Both Glasgow and Podrebarac testified. After the hearing and submission of supporting briefs by both parties, the district court filed a 14-page, detailed order finding that Glasgow had received the effective assistance of trial counsel.

On appeal, Glasgow contends that despite the district court's finding to the contrary, he received ineffective assistance of counsel because Podrebarac failed to investigate, obtain records of, or seek to present evidence of (1) S.G.'s false accusation of physical abuse; (2) K.J.G.'s accusation of sexual abuse by her stepfather; (3) Edie's threat to Glasgow of retaliation for K.J.G.'s accusation of abuse by Marty; and (4) the firing of Deputy Peralta. Although Glasgow raised additional allegations of ineffectiveness at the *Van Cleave* hearing, he does not raise or argue those allegations on appeal. Issues not briefed by the appellant are deemed waived and abandoned. *State v. Boleyn*, 297 Kan. 610, 633, 303 P.3d 680 (2013). Accordingly, we will review only the four claims of ineffectiveness raised by Glasgow on appeal.

Preliminarily, we begin with a summary of our standard of review and the law pertaining to ineffective assistance of counsel. A claim alleging ineffective assistance of counsel presents mixed questions of fact and law. *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014). When, as in this case, the district court has held an evidentiary hearing to consider the effectiveness of a defendant's trial counsel, appellate courts review the

26

underlying factual findings for support by substantial competent evidence and the legal conclusions based on those facts de novo. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015). Substantial competent evidence is evidence possessing both relevance and substance that a reasonable person could accept as being adequate to support a conclusion. *State v. Jolly*, 301 Kan. 313, 325, 342 P.3d 935 (2015).

To prevail on an ineffective assistance of counsel claim, it is not enough to merely surmise, with the benefit of hindsight, that another attorney may have tried the case differently. See *Thompson v. State*, 293 Kan. 704, 715, 270 P.3d 1089 (2011). Rather, before counsel's assistance can be found to be so defective as to require reversal of a conviction, the defendant must satisfy the constitutional standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). Under the *Strickland* test, a defendant must establish (1) counsel's performance was deficient, *i.e.*, counsel's performance fell below an objective standard of reasonableness, considering all the circumstances, and (2) there is "'a reasonable probability'" that, but for counsel's error(s), the result of the proceeding would have been different, *i.e.*, counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. *Fuller*, 303 Kan. at 486. "'[A] reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation omitted.]" *State v. Cheatham*, 296 Kan. 417, 432, 292 P.3d 318 (2013). A defendant must demonstrate both *Strickland* prongs to establish ineffective assistance of counsel, and a failure to prove either prong is dispositive. See *Smith v. Robbins*, 528 U.S. 259, 285-86 & n.14, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000).

"The benchmark for judging any claim of ineffectiveness must be whether the attorney's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Cheatham*, 296 Kan. 417, Syl. ¶ 3. "'Judicial scrutiny of counsel's performance in a claim of ineffective assistance of counsel is highly deferential and requires consideration of all the evidence

before the judge or jury. The reviewing court must strongly presume that counsel's conduct fell within the broad range of reasonable professional assistance.' [Citations omitted.]" *State v. Reed*, 302 Kan. 227, 244, 352 P.3d 530, *cert. denied* 136 S. Ct. 344 (2015). Thus, reviewing courts entertain a strong presumption that counsel's representation fell within the wide range of professional conduct, and when assessing performance courts must "make every effort to 'eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.' [Citation omitted.]" *Cheatham*, 296 Kan. at 431-32.

*S.G.'s Accusation of Glasgow's Prior Physical Abuse*

On appeal, Glasgow notes he testified at the *Van Cleave* hearing that he told Podrebarac, prior to trial, about S.G.'s false accusation that he had broken her arm and that the incident had been investigated by the Kansas Department of Social and Rehabilitation Services (SRS) before he had filed for custody of K.J.G. Glasgow argues that school records would have shown that S.G. had broken her arm when she hit a wall. However, during the hearing, Glasgow testified that he never spoke to the school about it and he did not know if school officials were aware that S.G. had injured her arm at school. Glasgow maintained that SRS cleared him of this accusation and he sent Podrebarac the paper from SRS that said he did not do it. Neither the paper nor any school records were produced at the *Van Cleave* hearing.

For his part, Podrebarac testified that he obtained his law degree from Creighton University and became a member of the Kansas bar in 1986. Since that time Podrebarac had been in private practice, served as prosecuting attorney in Meade County for 18 years, and later was a practicing criminal defense attorney. He was court-appointed to represent Glasgow in this litigation.

28

Podrebarac testified that he was aware of Glasgow's claim that S.G. falsely reported that Glasgow had physically injured her sometime prior to the rape allegation, but he did not believe this information would further his defense theory. Podrebarac did issue a subpoena duces tecum to S.G.'s school prior to the preliminary hearing, but when he later discovered the subpoena was never received, he did not pursue the matter. Podrebarac testified that he recalled S.G. denying that she made such an allegation at the preliminary hearing. At the preliminary hearing, S.G. recalled an incident when Glasgow threw her against a wall when she was in third grade, but she denied that Glasgow had been violent since that time.

The district court found that Podrebarac did not follow up when the subpoena was not served prior to the preliminary hearing. As to Podrebarac's performance, the district court determined that "[c]ounsel should have followed up to determine what, if any, evidence [school officials] might have had that could be used in the defense of the case."

With regard to the prejudice prong of the *Strickland* standard, the district court found that Glasgow failed to show prejudice by this failure of trial counsel:

> "At the *Van Cleave* hearing, the Defendant did not present any witnesses or other evidence to support his position that the victim was a liar or had lied about a broken arm. The Defendant does nothing more than speculate that this evidence was available. . . . Without evidence, this Court has nothing to show how the Defendant was prejudiced by trial counsel not talking with school personnel. Therefore, the Defendant has failed to meet his burden at this point."

We find substantial evidence in support of the district court's factual findings. Additionally, we agree with the district court's legal conclusion that Podrebarac's failure to further investigate Glasgow's claim was below the standard of effectiveness required of trial counsel. Finally, we agree with the district court's legal conclusion that prejudice has not been shown. Important to this finding is Glasgow's testimony that he never spoke

29

with school officials about this matter. This lack of knowledge, coupled with Glasgow's posttrial failure to provide any school reports or testimony about the incident at school and S.G.'s implicit denial of this allegation during the preliminary hearing, suggests scant support for Glasgow's claim that S.G. lied about a previous incident of physical abuse. The district court did not err in finding that counsel's deficient performance did not prejudice the defense and deprive Glasgow of a fair trial. See *Fuller*, 303 Kan. at 486.

*Accusation by K.J.G. of Sexual Abuse and Edie's Threat of Retaliation*

Glasgow claimed that Podrebarac was aware that S.G. had a motive to make false sexual abuse allegations about him because 2 years prior to the initiation of this case, her sister, K.J.G., had accused Marty of molesting her and Glasgow reported the accusations to the Sheriff's Department in Norton, Kansas. Edie subsequently told Glasgow that she would get back at him for K.J.G. filing those charges.

Podrebarac acknowledged that he was aware that K.J.G. had accused Marty of abusing her, but he could not recall whether he had any information as to whether there was an investigation about the accusation. The district court did not make any specific findings with regard to this particular claim of ineffectiveness.

Upon our review of this claim, we fail to find either ineffectiveness or prejudice. Assuming Glasgow's testimony was true, there was no evidence to support the notion that K.J.G.'s accusation against Marty was relevant or material to whether S.G. had falsely accused Glasgow of rape. Moreover, assuming that Edie had told Glasgow that she would seek retribution for his reporting of K.J.G.'s abuse, there was no evidence that Edie prompted S.G. to make up a false rape account to exact Edie's revenge. In short, regardless of Glasgow's report that Marty had molested K.J.G. 2 years prior to S.G.'s report of rape, without some evidence tying these facts to the commission of the rape

30

charge, this collateral matter was not relevant or material to any issue in controversy at Glasgow's trial.

We view this particular claim of ineffectiveness as a part of Glasgow's concern that Poderbarac did not sufficiently attack the credibility of S.G. and Edie. But our review of the record shows that Poderbarac did challenge the credibility of both S.G. and Edie. In particular, Poderbarac established that S.G. preferred Marty as her dad rather than Glasgow, that prior to the reported rape she did not want to have visitations with Glasgow, and that she was upset that K.J.G. wanted to live with him.

With regard to attacking Edie's credibility, Podrebarac established that Edie's relationship with Glasgow was only "so-so;" that while K.J.G. was closer to Glasgow, S.G. was closer to her; and that about the time of the reported rape Edie was upset because Glasgow wanted to change legal custody and have S.G. live with him. Evidence produced at the *Van Cleave* hearing also showed that Podrebarac had reviewed the transcript of the child custody hearing involving K.J.G. and the jury had heard testimony regarding the contentious nature of this litigation.

In summary, we are persuaded that Podrebarac did challenge the credibility of S.G. and Edie and developed evidence establishing the ongoing custody dispute which could have prejudiced S.G. and Edie against him. Podrebarac's failure to seek admission of evidence irrelevant and immaterial to attacking their credibility was not ineffective. Moreover, even assuming error, given Podrebarac's appropriate challenges to S.G.'s and Edie's credibility and the tenuousness of the challenged evidence that Glasgow claims would have undermined their credibility, we are convinced there is no reasonable probability that but for counsel's error the result of the proceeding would have been different. See *Fuller*, 303 Kan. at 486.

*The Firing of Deputy Peralta*

Glasgow contends that Podrebarac was ineffective for failing to investigate or seek information from the State as to why Deputy Peralta had been fired. At the *Van Cleave* hearing, Podrebarac acknowledged that although he was aware that Deputy Peralta had been released from the sheriff's office prior to Glasgow's trial, he did not request information from the sheriff's office regarding why the deputy was relieved of his duties. Podrebarac discussed the matter with the prosecutor; however, the content of that conversation is unknown. According to Podrebarac, he did not pursue the issue of Deputy Peralta's dismissal because he did not believe it was relevant because the deputy was not an integral part of his case.

The district court found that Glasgow made an inadequate showing that Podrebarac's representation was ineffective in this regard, noting that "*Van Cleave* counsel makes comments that his firing was not related to this case."

We agree with the district court that Glasgow failed to present any evidence indicating that Deputy Peralta's departure from the sheriff's department was related to any wrongdoing or improper investigative techniques regarding this criminal case. Moreover, the district court correctly noted *Van Cleave* counsel's concession during argument that "Officer Peralta had been fired for reasons with regard to his line of duty that [were] not related to this case."

We conclude the district court did not err when it found that Podrebarac was not ineffective in failing to investigate the dismissal of Deputy Peralta. Additionally, we are convinced that if there was error, Glasgow has failed to establish prejudice.

Finally, Glasgow argues that cumulative trial errors require the reversal of his conviction because these errors deprived him of the right to a fair trial. The State, on the other hand, responds that Glasgow received a fair trial with a potential single harmless error—attempting to define "beyond a reasonable doubt"—and by definition, this potential single instance of harmless error cannot be cumulative.

When conducting a cumulative error analysis, """an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless."' [Citations omitted.]" *State v. Fisher*, 304 Kan. 242, 263, 373 P.3d 781 (2016). In other words, the question becomes whether the totality of the circumstances substantially prejudiced the defendant and deprived him or her of a fair trial. 304 Kan. at 263.

We have identified only one trial error—the prosecutor's misconduct in modifying the definition of reasonable doubt as found in PIK Crim. 4th 51.010. "The cumulative error doctrine '"does not apply if no error or only one error supports reversal."' [Citations omitted.]" *State v. Page*, 303 Kan. 548, 558, 363 P.3d 391 (2015). Accordingly, cumulative error did not deny Glasgow the right to a fair trial.

Affirmed.